Volume 1 of 2

## ON REHEARING EN BANC
### PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SHAWN PAUL HUMPHRIES,
        *Petitioner-Appellant,*

v.

JON E. OZMINT, Director, South
Carolina Department of Corrections;
HENRY DARGAN MCMASTER,
Attorney General, State of South
Carolina,

        *Respondents-Appellees.*

No. 03-14

Appeal from the United States District Court
for the District of South Carolina, at Anderson.
Joseph F. Anderson, Jr., Chief District Judge.
(CA-02-4276-8-17BI)

Argued: October 27, 2004

Decided: February 4, 2005

Before WILKINS, Chief Judge, WIDENER, WILKINSON,
NIEMEYER, LUTTIG, WILLIAMS, MICHAEL, MOTZ,
TRAXLER, KING, GREGORY, SHEDD, and DUNCAN, Circuit
Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Senior Judge Hamilton wrote the
opinion, in which Chief Judge Wilkins and Judges Widener, Nie-
meyer, Luttig, Williams, Motz, Traxler, King, and Shedd joined.

Judge Luttig wrote a concurring opinion. Judge Wilkinson wrote a dissenting opinion, in which Judges Michael, Gregory, and Duncan joined.

---

## COUNSEL

**ARGUED:** Teresa Lynn Norris, CENTER FOR CAPITAL LITIGA-TION, Columbia, South Carolina, for Appellant. Donald John Zelenka, Chief Deputy Attorney General, OFFICE OF THE ATTOR-NEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellees. **ON BRIEF:** Thomas R. Haggard, Ridgeway, South Carolina; Joseph Maggiacomo, CENTER FOR CAPITAL LIT-IGATION, Columbia, South Carolina, for Appellant. Henry Dargan McMaster, Attorney General, John W. McIntosh, Chief Deputy Attorney General, Columbia, South Carolina, for Appellees.

---

## OPINION

HAMILTON, Senior Circuit Judge:

On August 5, 1994, Shawn Paul Humphries was convicted in the Circuit Court for Greenville County, South Carolina of murder, attempted robbery, possession of a firearm during the commission of a violent crime, and criminal conspiracy. Following a sentencing hearing, the jury recommended a sentence of death for the murder conviction and, in accordance with the jury's verdict, the state trial court sentenced Humphries to death for that conviction. After exhausting his state remedies, Humphries filed a petition for a writ of habeas corpus in the United States District Court for the District of South Carolina, 28 U.S.C. § 2254, which the district court dismissed.[1]

---

[1]Initially, Humphries named Gary Maynard, former commissioner of the South Carolina Department of Corrections, and Charles Condon, South Carolina's former attorney general, as respondents. Now, Jon Ozmint and Henry McMaster, respectively, hold these positions and have been substituted as respondents, Fed. R. Civ. P. 25(d)(1). For ease of reference, we will refer to respondents as "the State" throughout this opinion.

On July 25, 2005, the district court granted Humphries a certificate of appealability, 28 U.S.C. § 2253. For the reasons stated below, we affirm the district court's dismissal of Humphries's habeas petition.

I

As found by the South Carolina Supreme Court on direct appeal, the facts of this case are as follows:

> On January 1, 1994, Humphries shot Dickie Smith, the owner of the Max-Saver convenience store in Fountain Inn, South Carolina. The evidence at trial established that on the night before the killing, Humphries and his friend Eddie Blackwell drove around drinking beer. They also stole a gun that night. Shortly after 7:00 a.m. on January 1, they entered the Max-Saver convenience store. Smith, who was working in the store, asked Humphries whether he wanted something hot, and Humphries flashed the stolen gun and replied that he wanted money.

> There was some evidence to suggest Smith then reached under a counter to pull out a gun. The video camera at the store recorded the shooting. When Smith reached under the counter, Humphries fired a shot in Smith's direction and fled from the store. The bullet fired by Humphries struck Smith in the head, killing him. Meanwhile, Blackwell slumped to the ground in the store. The police arrested Blackwell at the scene and apprehended Humphries later that day.

*State v. Humphries*, 479 S.E.2d 52, 53 (S.C. 1996).

On July 12, 1994, a Greenville County grand jury charged Humphries with the following offenses: (1) murder; (2) attempted robbery; (3) possession of a firearm during the commission of a violent crime; and (4) criminal conspiracy. On August 1, 1994, the case went to trial and the jury returned a verdict of guilty on all counts.

During the separate sentencing phase of Humphries's trial, the solicitor proffered, and the state trial court admitted, all of the evi-

dence that was admitted during the guilt phase of the trial. Following the court's admission of this evidence, the solicitor called two witnesses from Dickie Smith's family, his brother Randy Smith and his wife Pat Smith. These witnesses testified about Dickie Smith's childhood, upbringing, work ethic, generosity, and close relationship with his young daughter Ashley.

Randy Smith testified that he and Dickie Smith grew up in a poor family that did not have hot water. When Dickie Smith was nine-years old, his father died. After his father's death, Smith and the other family members began working to support the family. Randy Smith testified that, when Dickie Smith was in the ninth grade, he took a job after school as a meat cutter at a Bi-Lo grocery store, working until 10:00 or 11:00 p.m. at night. In the tenth grade, Dickie Smith acquired a full-time job working second shift in a textile mill while continuing to attend school. Randy Smith testified everyone in the community liked Dickie Smith and he was a good person.

During her testimony, Pat Smith described Dickie Smith as ambitious, hardworking, and generous. For instance, after receiving one technical degree and becoming a supervisor, Dickie Smith went back to school to get his residential home builder's license and began building houses in 1986. Ashley was born in 1988. Pat Smith described Dickie Smith and Ashley's relationship as very close and testified that Ashley was having a hard time since her father was killed and was receiving counseling.

Following this testimony, the state moved to admit a photograph of the crime scene and documentary evidence demonstrating that Humphries was adjudicated as delinquent in 1985 for two breaking and enterings, convicted in 1989 in Anderson County, South Carolina of burglary and larceny, and convicted of larceny in Alabama in 1990.

In terms of making a case in mitigation, Humphries's strategy was four-fold. First, he sought to establish that there was no intent to kill by demonstrating that: (1) he pulled the trigger after he panicked in reaction to Dickie Smith's attempt to reach under the counter; (2) he did not kill Donna Brashier who was also in the store during the shooting; (3) he drove off without Eddie Blackwell; and (4) he voluntarily confessed to the killing. Next, Humphries sought to demonstrate

that he was a nonviolent person who had no significant history of engaging in violent acts. He also sought to show that he was a young man who had an extensive history of emotional, physical, and substance abuse. Finally, Humphries sought to show that he was a trustworthy, respectful, and pleasant person.

In support of this strategy, Humphries called thirteen witnesses. The first witness was Albert Humphries, Humphries's paternal grandfather. He testified that Humphries and his brother, Richard Humphries, lived with him and Humphries's grandmother from the time Humphries was three-years old until Humphries was twelve-years old. Albert Humphries testified that he and his wife were heavy drinkers and that his wife grew marijuana in their backyard. Albert Humphries described his son, Humphries's father, as unpredictably violent, noting that he had been to prison several times. Albert Humphries testified that his son had cut him on the arm with a knife and had kicked Humphries's grandmother in the face, knocking her false teeth out.

Patricia Goode, Humphries's aunt, testified that Humphries's father had said on numerous occasions that he never loved his children and that the children should have been aborted.

Humphries's mother, Carla Scott, testified that, after she left Humphries's father, she became pregnant with Humphries as a result of his father raping her at knife point. She stated that she eventually left the children with their paternal grandparents and married several more times. She reunited with the children only after she married someone who would allow the children to live with her.

Scott also discussed Humphries's criminal record. According to Scott, Humphries was arrested in 1984 for two counts of breaking and entering and was placed on probation. Thereafter, he was given more probation after he was suspended from school for fighting several times. After Humphries's second probation revocation when he was fifteen years old, he was sent to a state facility in Columbia, South Carolina for thirty days and was placed on probation again. Humphries was arrested in January 1989 for breaking into a church, apparently looking for food because he had been living on the street for a week. Humphries pled guilty to that charge and was placed on proba-

tion. In 1990, Humphries was charged in Alabama with stealing an automobile. As a result of that charge, Humphries was sentenced to two years' imprisonment followed by four years of probation.

Debbie Humphries, Humphries's step-mother, testified that Humphries's father used a combination of alcohol, drugs, and paint fumes every day and had shared those substances with Humphries from 1983 to 1992. Richard Humphries, Humphries's brother, testified regarding the circumstances in which he and Humphries grew up, including: (1) their father's violence toward his own parents; (2) the lack of hot water and sometimes running water; (3) the lack of food; and (4) the trips taken to the dumpsters to find school clothes.[2]

Preston Taylor testified that, when he was employed by the Department of Youth Services, he had numerous contacts with Humphries, who was thirteen at the time. According to Preston Taylor, Humphries was a pleasant, respectful, cooperative, and nonviolent boy.

Mary Shults, an expert witness with a degree in sociology and a master's degree in social work, testified regarding Humphries's social history. She related that Humphries had been reminded throughout his life that he was a product of rape. Shults stated that Humphries's father was incredibly violent, would kick people in the face, cut people, and would refer to himself as Satan. In addition, Shults testified Humphries's father introduced Humphries to drugs and alcohol between the ages of six and ten.

Humphries's case in mitigation was closed with the testimony of three witnesses, two family friends (Tammy Compton and David Shaw) and his step-sister, Jamie Scott. Tammy Compton testified she trusted Humphries enough to leave her children with him and David Shaw testified Humphries was a good, nonviolent person. Jamie Scott testified she loved her step-brother a lot and wanted to see the jury return a life sentence.

---

[2]The unfortunate circumstances of Humphries's upbringing were further confirmed by the testimony of two other witnesses, Ruby Badsen, Humphries's maternal grandmother, and Lindsay Badsen, Humphries's uncle.

Before the state trial court gave the jury its final instructions, the solicitor and counsel for Humphries gave their closing arguments. In his closing argument, the solicitor broke his argument down into four parts, commenting to the jury that

> [y]ou look at four things in deciding the issue of punishment. You look at the aggravation. Is it an aggravated murder? You look at the character of the Defendant. You look at any mitigation, statutory mitigation or other mitigation they've presented to you. And the last thing you look at is the victim, his uniqueness. What harm to the community and to the victim and to the family did this Defendant cause? Those are the four things you look at.

The solicitor then turned his attention to the evidence in aggravation. The solicitor argued that the evidence in this case clearly established the statutory aggravating circumstance relied upon by the State, that the murder was committed during the commission of a robbery while Humphries was armed with a deadly weapon.[3] Then, the solicitor turned to Humphries's character and summarized Humphries's checkered past in great detail, stating:

> He's been in trouble since he was 13 years old. When he was 13 years old, he committed two breaking and enterings, and he was given probation. He was given a chance by the Family Court judge at age 13.

> He missed school. He got in fights at school. He got suspended at school. He ran away. And so they brought him back in at age 14 on a probation revocation, and he was given yet another chance, stricter conditions. And again, he skipped school. He ran away. He was disruptive in school. He got suspended.

---

[3]The jury was presented with one aggravating circumstance (murder committed during the commission of a robbery while armed with a deadly weapon) and two statutory mitigating circumstances (no significant prior criminal history and the age of the defendant). The jury was also instructed to consider any other circumstances it found to be mitigating.

So at age 15 he's brought back in for another probation revocation. And this time the Family Court Judge said, "You know, enough is enough. We're going to send you down to Columbia. We're going to send you down there [to] see if we can't figure out what makes you tick."

And they do all kind[s] of psychological reports and things that I'll talk about in just a moment. And he comes back, and at age 16 is an habitual truant, and he basically drops out of school, and at age 17 he burglarizes the church and steals from the church, and he's given probation.

And at age 18 he goes to Alabama, and he's convicted of larceny down there, and he's sent to jail for two years. And he gets out when he's age 20, and at 21 he fails to report. They issue a warrant for him. He's still on probation. And at age 22 he commits a murder and attempted armed robbery.

The solicitor then addressed the evidence in mitigation presented by Humphries. The solicitor argued to the jury that there was a complete lack of mitigating evidence, arguing that Humphries had a significant history of prior criminal convictions for crimes of violence and that his relatively young age (twenty-two), mental capacity, and occasional drug and alcohol use were of no moment.

Finally, the solicitor turned to Dickie Smith's uniqueness as an individual. In this regard, the solicitor stated:

Dickie Smith was born in 1950, fourth son, fifth child of a fellow named Alton Smith and a sweet lady named Lottie Mae Darnell Smith. They grew up poor. They didn't have hot water. They had a spigot coming in and a tub next to the stove, and they had a few acres of cotton.

Dickie Smith is as much about this case as Shawn Paul Humphries. When Alton Smith died when Dickie was nine, he pulled himself up by his bootstraps and he started contributing to the family. He got all kinds of odd jobs picking

cotton at a penny a pound, hunting rabbits, skinning them, dressing them out, selling them for 50 cents.

When he's 14 years old, he gets a job in Greenville at the Bi-Lo in the Meat Department working after school. He's gone to school all day. From after school til about 10:00 or 10:30 at night working at Bi-Lo, saving his money, buying a car for the family.

When he's in tenth grade, he goes down to Boenett's and he gets a full-time job, second shift. He's going to school all day, and he's working until midnight, contributing. Lottie Mae Darnell Smith with eight kids, got them all out of high school, all at least a tech degree, some of them through college.

When Dickie Smith finished high school, he went to work for Union Carbide, then Kemet, but he didn't stop there. He kept improving himself. He went to Tech, he got an engineering degree, and he became a supervisor, and then he went back to Tech because he decided he wanted to build houses, and he got his—another degree at Tech, and he got his builder's license.

And in 1984 he met Pat, and they fell in love, and they got married. That's the same year Shawn Paul Humphries committed two house break-ins at age 13. In 1986 Dickie makes a pretty drastic move. He decides he's going to quit Kemet and go build houses full-time, and he goes out, and he starts building homes in the community he had grown up in. That's the same year Shawn Paul Humphries is up for his second probation violation and sent down to Columbia.

Then in 1988, July the 4th, they have a little baby girl named Ashley. You know, the Defense brought in a 12 year old stepdaughter—stepsister, said, "Please don't put Shawn Paul Humphries in the electric chair." I'm sorry I did not feel it was appropriate to bring in a six year old girl Ashley and parade her in front of you.

In 1988 Ashley is born. That's the same year Shawn Paul Humphries went to jail for two years. And in the spring of 1992, I believe, Dickie Smith opens the doors to the Max-Saver, building a business down in that community.

You have the right to look at the uniqueness of the individual. I would submit to you that Dickie Smith, by everybody's description to you was a unique individual. He grew up in that southern part of Greenville County below Simpsonville that was mainly farming, cotton, agriculture area.

And he grew up watching it change to industrial. And he first went to work for one of the industries at Union Carbide, and then he decided he was going to be part of that change, and he started building houses down there and building a business down there.

After finishing the portion of his closing argument concerning Dickie Smith's uniqueness, the solicitor then concluded his argument by arguing the following to the jury:

Who is the victim here, Shawn Paul Humphries or is it Dickie Smith? Who is the victim? Is it this guy over here or is it Donna, Donna Brashier, who's got to hear that gunshot every day of her life and who's got to see Dickie Smith laying on the floor every day of her life?

Who is the victim? Is it this Defendant or is it this lady right here, his momma, or his wife, or Ashley, who the only way she can see her daddy is to go visit his grave on Sunday after church?

There are a lot of reasons for punishment. Rehabilitation is one reason, and rehabilitation is a proper goal in some circumstances, but you've got to decide about whether this Defendant, who at 13 is breaking the law, at 14 is breaking the law, at 15 is breaking the law, at 17 is going—is breaking the law, at 18 is breaking the law and going to jail, who's been given every chance that the system offers. You decide if you're going to rehabilitate him.

What are some other reasons for punishment? Retribution is a reason for punishment. That may not sound good, may not sound right, but, in fact, it is part of punishment, because retribution is our community saying you have done something wrong and we're going to punish you. . . .

When you look at a case like this, when you look at the aggravation, when you look at the total lack of mitigation, I would submit, when you look at the character of this Defendant, and when you look at Dickie Smith, how profane when you look at all the circumstances of this crime and of this Defendant, how profane to give this man a gift of life under these circumstances. . . .

What punishment do you recommend when a man is defending his co-worker, he's defending his store, he's defending what he has built, and he's ducking behind the counter, and somebody takes a nine millimeter and executes him? What punishment do you recommend? What punishment do you recommend when you've got a character like that? What punishment do you recommend when somebody like Dickie Smith is taken from us?

If not now, then when? If not in a case that's as aggravated as this, then when do you do it? The defense may say, "Well, you can think of all kinds of aggravating cases." You can think of this and you can think of that. You look at the circumstances of this case.

If not in a case as aggravating as this, if not in a case with absolutely no mitigation like this, if not in a case with a character like this, if not in a case when somebody like Dickie Smith is taken, then when are you going to do it? It's not supposed to be easy. It's never been easy. It won't be easy in the future.

Shawn Paul Humphries comes into this courtroom asking you for mercy. Shawn Paul Humphries comes in here and asks you for mercy, and I ask you what mercy did he give? Shawn Paul Humphries comes in here and asks you for

mercy, and he gave none. Shawn Paul Humphries comes in
here and asks you for life, and he gave death. Is that fair?
Is that justice? That's what you're here for is justice. It's up
to you.

In his closing argument, counsel for Humphries argued that the
death penalty was unwarranted for several reasons. First, counsel for
Humphries emphasized that there was no evidence of an intent to kill
because Humphries: (1) pulled the trigger after he panicked in reac-
tion to Dickie Smith's attempt to reach under the counter; (2) did not
kill Donna Brashier; (3) drove off without Blackwell; and (4) volun-
tarily confessed to the killing. Counsel also argued that Humphries
was a nonviolent person who had no significant history of engaging
in violent acts. Counsel argued that Humphries was a young man who
had an extensive history of emotional, physical, and substance abuse.
Finally, counsel argued that Humphries was a trustworthy, respectful,
and pleasant person.

Following the state trial court's instructions and the jury's delibera-
tions, the jury recommended a sentence of death for the murder con-
viction and, in accordance with the jury's verdict, the state trial court
sentenced Humphries to death for that conviction.[4] At the post-trial
motions hearing, Humphries's counsel objected to the solicitor's use
of comparisons between Dickie Smith and Humphries during his clos-
ing argument, and the state trial court overruled the objection.

On direct appeal, the South Carolina Supreme Court affirmed the
state trial court's judgment. *Id.* at 57. On June 9, 1997, the United
States Supreme Court denied Humphries's petition for a writ of cer-
tiorari. *Humphries v. South Carolina*, 520 U.S. 1268 (1997).

On September 16, 1997, Humphries filed an application for post-
conviction relief in state court, which he later amended. Following an
evidentiary hearing, the state habeas court dismissed the application.
On June 18, 1999, Humphries filed a petition for a writ of certiorari
in the South Carolina Supreme Court. On September 27, 2001, the
South Carolina Supreme Court granted the petition for a writ of cer-

---

[4]For the other counts of conviction, Humphries received concurrent
twenty-year sentences.

tiorari and requested the parties proceed with briefing. Humphries, through appellate counsel, briefed the following issue in his petition for certiorari: "Counsel did not provide petitioner effective assistance at sentencing because they failed to object timely to the solicitor's closing argument suggesting that the petitioner deserved to die because his life was worth less than the victim's." The Supreme Court of South Carolina affirmed the state habeas court's judgment on August 26, 2002. *Humphries v. State*, 570 S.E.2d 160, 168 (S.C. 2002).

On December 24, 2002, Humphries filed a petition for a writ of habeas corpus in the United States District Court for the District of South Carolina. On January 29, 2003, the State filed a motion for summary judgment. Humphries filed his response on February 14, 2003. On February 25, 2003, a United States Magistrate Judge reported and recommended that Humphries's habeas petition be denied. On June 19, 2003, the district court, after conducting a *de novo* review of the record, granted the State's motion for summary judgment and dismissed the petition. On July 25, 2003, the district court granted Humphries a certificate of appealability, 28 U.S.C. § 2253.

On May 3, 2004, a divided panel of this court vacated Humphries's death sentence and remanded the case with instructions to issue the writ solely for the purpose of resentencing. *Humphries v. Ozmint*, 366 F.3d 266 (4th Cir. 2004). The State filed a timely petition for rehearing with a suggestion for rehearing *en banc* to which Humphries filed a response. A majority of the active circuit judges voted to rehear this case *en banc*, which resulted in the vacatur of the panel opinion.

II

Our standard for collateral review of a state court's decision on the merits under 28 U.S.C. § 2254(d) is well-settled. A federal court may not grant a writ of habeas corpus unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The phrase "clearly established Federal law," *id.*, "refers to the holdings, as opposed to the dicta, of the [Supreme] Court's

decisions as of the time of the relevant state-court decision." *Booth-El v. Nuth*, 288 F.3d 571, 575 (4th Cir.) (internal quotation marks omitted), *cert. denied*, 537 U.S. 959 (2002). Further, a state court's decision is "contrary to" clearly established federal law, as determined by the Supreme Court, either: (1) "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Finally, "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Notably, an "unreasonable application of federal law is different from an incorrect application of federal law," because an incorrect application of federal law is not, in all instances, objectively unreasonable. *Id.* at 410.

## III

Humphries contends that his trial counsel were constitutionally ineffective when they failed to object to a portion of the solicitor's closing argument at sentencing. According to Humphries, the State violated the dictates of *Payne v. Tennessee*, 501 U.S. 808 (1991), when the solicitor in effect argued to the jury during the sentencing phase of the trial that Humphries deserved the death penalty because Dickie Smith (the victim) was a worthy individual and an asset to the community while Humphries was not. Humphries posits that, not only was his counsel deficient for failing to object, but also that he was prejudiced by this failure as well. To properly analyze Humphries's *Payne* claim, we must take a close look at the Supreme Court's precedent concerning victim-impact evidence.

## A

In *Booth v. Maryland*, 482 U.S. 496 (1987), the Supreme Court held that the Eighth Amendment prohibits a state from allowing a capital sentencing jury to consider victim-impact evidence. *Booth* involved the brutal murders of an elderly couple, Irvin and Rose

Bronstein. *Id.* at 497. During the sentencing phase of the trial, the prosecutor read a victim-impact statement that was compiled by a probation officer on the basis of her interviews with the Bronsteins' surviving family members. *Id.* at 498-500. The victim-impact statement included all three forms of victim-impact evidence: accounts of the emotional and psychological impact of the crime on the family, descriptions of the Bronsteins' personal characteristics, and the victims' family members' opinions and characterizations of the crimes and the defendant. *Id.* at 499-500.

In *Booth*, the Court held that all three forms of victim-impact evidence are irrelevant to a determination of whether to impose a death sentence, and that their admission thus risks arbitrary and capricious imposition of the death penalty. *Id.* at 502-03. The Court noted that, because victim-impact evidence includes facts about which the defendant was unaware at the time of the murder, it is unrelated to the defendant's culpability. *Id.* at 505. The Court further noted that admitting victim-impact evidence would yield arbitrary results because victim-impact evidence would lead juries to impermissibly base their decision on their evaluation of the relative worth of the victim, and because the capital sentencing decision would partially depend upon the degree to which the victim's family members—if the victim leaves any behind—are able to articulate their loss. *Id.* at 505-06. Moreover, the Court stated that victim-impact evidence improperly shifts the jury's focus from the defendant to the victim, and, thus, yields death sentences based on emotion rather than reason. *Id.* at 507-08.

In *South Carolina v. Gathers*, 490 U.S. 805 (1989), the Supreme Court extended *Booth* to cover a prosecutor's comments on the murder victim's personal characteristics. *Id.* at 811-12. In that case, in an attempt to enable the jury to more fully comprehend the human loss involved in the murder of a mentally unstable homeless man, the prosecutor made various references in his closing argument at the sentencing phase about the victim's personality and character, including inferring from the victim's possession of religious articles and a voter registration card that the victim was a man of faith who cared about his community, reading a prayer written by the victim that was found at the murder scene, and noting that the victim had mental problems. *Id.* at 808-10. The Court found that the prosecutor's statements were

"indistinguishable in any relevant respect from that in *Booth*" and, thus, likewise violative of the Eighth Amendment. *Id.* at 811. According to the Court, while victim-impact evidence relevant to the circumstances of the crime is admissible, the prosecutor's statements went far beyond those facts. *Id.* at 811-12.

In *Payne*, the Court overruled both *Booth* and *Gathers*. The *Payne* case involved a brutal attack of a mother and her two small children that left the mother and one of her children dead. *Payne*, 501 U.S. at 812-13. At the sentencing phase of the trial, the prosecutor presented the testimony of the children's grandmother, who testified about the effect of the crimes on the now-orphaned child. *Id.* at 814-15. Additionally, the prosecutor commented extensively on the impact of the murders on the orphaned child and said that the child will "want to know what type of justice was done" when he is older. *Id.* at 815.

In the *Payne* decision, the Court observed that "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Id.* at 825. Furthermore, the Court observed that *Booth* "unfairly weighted the scales in a capital trial; while virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering 'a glimpse of the life' which a defendant 'chose to extinguish,'" *id.* at 822 (quoting *Mills v. Maryland*, 486 U.S. 367, 397 (1988) (Rehnquist, C.J., dissenting)), or "demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide." *Id.* Consequently, the Court concluded that, "if the State chooses to permit the admission of victim-impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Id.* at 827. Of note, the *Payne* Court did not alter *Booth*'s holding that admitting evidence of the victims' opinions of the crime and of the appropriate sentence for the defendant violates the Eighth Amendment; rather *Payne* only allows evidence of the victim's personal characteristics and the harm inflicted upon the victim's family and community. *Id.* at 829 n.2. The Court in *Payne* noted that there was "no reason" to treat victim-impact evidence "differently than other relevant evidence," *id.* at 827, but cautioned that, "[i]n the event that evidence is introduced that is so

unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* at 825.

The Court in *Payne* did not set the parameters of what type of victim-impact evidence would render a trial fundamentally unfair under the Due Process Clause of the Fourteenth Amendment. As noted earlier, the *Payne* Court did observe that courts should handle the admission of victim-impact evidence just like any other relevant evidence. 501 U.S. at 827. However, the only inkling in *Payne* on the limitations imposed on the admission of victim-impact evidence is the Court's citation to *Darden v. Wainwright*, 477 U.S. 168 (1986). *Payne*, 501 U.S. at 825.

In *Darden*, the Court addressed prosecutorial misconduct at the guilt phase of a capital murder trial. In addressing Darden's argument that his trial and resulting conviction were fundamentally unfair because of the prosecutor's improper argument, the Court characterized the inquiry as whether the improper comments were so unfair as to make the conviction a denial of due process. *Darden*, 477 U.S. at 181. The *Darden* Court based its due process standard on *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), another prosecutorial misconduct case. In considering DeChristoforo's claim that his first degree murder conviction violated his due process rights, the Court stated that the due process analysis properly addresses more than just the questionable prosecutorial conduct itself. *Id.* at 639. Instead, a court making a due process inquiry must consider the challenged conduct in relation to the proceeding as a whole. *Id.* The analysis of a due process claim premised on unfair prosecutorial conduct may thus depend upon numerous factors, which include the nature of the prosecutorial misconduct, *Darden*, 477 U.S. at 181-82, the extent of the improper conduct, *DeChristoforo*, 416 U.S. at 645, the issuance of curative instructions from the court, *Darden*, 477 U.S. at 182, any defense conduct inviting the improper prosecutorial response, *id.*, and the weight of the evidence. *Id.*; *see also Boyd v. French*, 147 F.3d 319, 329 (4th Cir. 1998) (holding that a prosecutorial misconduct determination requires the court to look at the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the court's charge, and whether the errors were isolated or repeated). Based on this precedent, it is evident that both *Dar-*

*den* and *DeChristoforo* apply to cases in which the defendant or petitioner alleges that the admission of victim-impact evidence or prosecutorial comment on victim-impact evidence violated his rights under the Due Process Clause of the Fourteenth Amendment.

B

In its decision on state habeas, the South Carolina Supreme Court first held that *Payne* only prohibited comparisons between the victim and other members (victims) of the community. *Humphries*, 570 S.E.2d at 167-68. Because no such victim-to-victim comparison was made in the case, the South Carolina Supreme Court held that *Payne* did not *ipso facto* prohibit the solicitor's closing argument. *Id.* Because *Payne* did not specifically prohibit victim-to defendant comparisons, the South Carolina Supreme Court went on to address the question of whether the solicitor's argument rendered Humphries's sentencing proceeding fundamentally unfair. The court did not view the solicitor's argument as improper, let alone that it rendered Humphries's sentencing proceeding fundamentally unfair. In reaching this conclusion, the court stated:

> In our opinion, the solicitor's closing argument did not render sentencing fundamentally unfair as they [sic] did not prejudice Petitioner. The solicitor's comments were based on evidence already in the record. Smith's wife and brother testified during the penalty phase regarding each of the facts about Smith's life upon which the solicitor commented. Petitioner presented the testimony of thirteen witnesses in mitigation during the sentencing phase who attested to Petitioner's at-risk childhood and subsequent criminal acts as a juvenile and young adult, providing all the evidence of Petitioner's character discussed by the solicitor in his closing.
>
> Through the testimony of Petitioner and Smith's family members, both the similarities (the childhood poverty and adversity) and the differences (the manner in which Petitioner and Smith dealt with their circumstances) were readily apparent to the jurors, before the solicitor's closing argument. As permitted by *Payne*, the State offered evidence of Smith's "uniqueness" as an individual by describ-

ing the successful ways in which Smith dealt with adversity in his life. Likewise, Petitioner introduced evidence of his own "uniqueness" through the testimony of thirteen witnesses (compared to Smith's two witnesses) regarding his own difficult childhood and background, thereby inviting a comparison between Petitioner and Smith's respective characters even before the solicitor gave his closing remarks. As such, we do not believe the solicitor's comments were so prejudicial (if prejudicial at all) that they rendered Petitioner's death sentence fundamentally unfair under the Due Process Clause.

To reverse the PCR court's denial of relief, this Court must find, first, that counsel was ineffective, and, second, that counsel's ineffectiveness resulted in prejudice. *Payne* does not prohibit character comparisons between defendants and victims; it prohibits comparisons that suggest that there are worthy and unworthy victims. Therefore, Petitioner cannot establish either the ineffectiveness prong or the prejudice prong of the test as required to overturn the PCR court's denial of relief.

*Humphries*, 570 S.E.2d at 167-68.

## C

As noted earlier, Humphries claims that the solicitor's closing argument at the sentencing phase of the trial, taken as a whole, in effect asked the jury to impose the death penalty because Dickie Smith was a worthy individual and an asset to the community while Humphries was not. According to Humphries, such comparative worth arguments run afoul of the dictates of *Payne* and the Due Process Clause of the Fourteenth Amendment and, therefore, his trial counsel were constitutionally ineffective for failing to object to the solicitor's closing argument.

In advancing his argument, Humphries does not posit that any one of the solicitor's comments, standing alone, was improper or factually inaccurate. Thus, his collectivity argument focuses on a few of the solicitor's comments, which he contends created an impermissible sit-

uation in which the solicitor asked for a sentence of death based solely on the relative worth of his life and the life of Dickie Smith. In particular, Humphries objects to the year-by-year chronology, wherein the history of his life was compared to the history of Dickie Smith's life.[5] Humphries also takes issue with three statements made by the solicitor near the end of his closing argument which, when coupled with the year-by-year chronology, allegedly rendered the solicitor's argument constitutionally infirm. The statements are: (1) "[W]hen you look at the aggravation, when you look at the total lack of mitigation, I would submit, when you look at the character of this Defendant, and *when you look at Dickie Smith, how profane when you look at all the circumstances of this crime and of this Defendant, how profane to give this man a gift of life under these circumstances*"; (2) "What punishment do you recommend when you've got a character like that? *What punishment do you recommend when somebody like Dickie Smith is taken from us*?"; and (3) "If not in a case as aggravating as this, if not in a case with absolutely no mitigation like this, if not in a case with a character like this, *if not in a case when somebody like Dickie Smith is taken*, then when are you going to do it?"

We conclude that the South Carolina Supreme Court did not unreasonably apply *Payne* when it held that the solicitor's closing argument at the sentencing phase of the trial, taken as a whole, did not render Humphries's sentencing proceeding fundamentally unfair. First, the record in this case simply belies Humphries's claim that the solicitor's comparison of the lives of both Humphries and Dickie Smith was the centerpiece of the solicitor's argument. It was not. As set forth above, the solicitor's life history comparison contained in the year-by-year chronology essentially was the manner in which the solicitor chose to present to the jury the argument that Dickie Smith was a unique individual. Within that year-by-year chronology, the solicitor referenced Humphries four times, telling the jury that: (1) "Dickie Smith is as much about this case as . . . Humphries"; (2) Humphries "committed

[5]Within the year-by-year chronology, the solicitor referenced Humphries four times, telling the jury that: (1) "Dickie Smith is as much about this case as . . . Humphries"; (2) Humphries "committed two house break-ins at age 13"; (3) in 1986 Humphries violated the terms of his probation and was "sent down to Columbia"; and (4) in 1988 Humphries went to prison for two years.

two house break-ins at age 13"; (3) in 1986 Humphries violated the terms of his probation and was "sent down to Columbia"; and (4) in 1988 Humphries went to prison for two years. The bulk of the solicitor's argument was not that Humphries should die because his life was worth less than Dickie Smith's. Indeed, the solicitor did not use the words "worth," "comparative worth," or "value" in his year-by-year chronology. Rather, the bulk of the solicitor's argument was devoted to the evidence in aggravation, Humphries's lack of character, the absence of mitigating evidence in the case, and an explanation how these facts, along with the victim-impact evidence, warranted the imposition of a death sentence.

To be sure, the portion of the solicitor's argument dealing with Dickie Smith's unique personal characteristics is contained in less than four pages of an approximately twenty-eight page transcript of the solicitor's closing argument and, during this segment of the solicitor's closing argument, Humphries is mentioned just four times. Further, after the solicitor made his final reference to Humphries in his year-by-year chronology by telling the jury that in 1988 Humphries "went to jail for two years," the solicitor followed two sentences later with the reminder to the jury that it had "the right to look at the uniqueness of the individual." The solicitor then added that "Dickie Smith, by everybody's description to you was a unique individual." Moreover, the solicitor essentially concluded his argument by asking the jury to impose a sentence of death because: (1) the evidence in aggravation was overwhelming; (2) there was a complete lack of mitigating evidence; (3) Humphries's character was poor; and (4) "somebody like Dickie Smith [was] taken." The solicitor's closing argument, as outlined above, simply did not invite the jury to return a sentence based on the relative worth of the lives of Dickie Smith and Humphries. Rather, the solicitor invited the jury to consider all of the evidence in the record in reaching its verdict. That being the case, it cannot be said that the South Carolina Supreme Court unreasonably applied *Payne* to the facts of this case.

Second, the solicitor's life history comparison contained in the year-by-year chronology was based upon facts established during the trial and were aspects of the trial which were readily apparent to the jury. Indeed, the circumstances of Dickie Smith's life and the impact of his death on his family were thoroughly presented without contem-

poraneous objection through the testimony of Randy and Pat Smith. The circumstances of Humphries's upbringing were thoroughly explored by Humphries's counsel in the thirteen witnesses called by the defense. Because the solicitor's life history comparison contained in the year-by-year chronology was based on evidence already before the jury, it is hard to take issue with the South Carolina Supreme Court's conclusion that Humphries was not prejudiced by the solicitor's comments.

Third, the facts concerning Humphries's character referred to by the solicitor in his comparison were already thoroughly recounted in greater detail in an earlier portion of the solicitor's closing argument. No objection, even to this date, is being raised concerning this earlier portion of the solicitor's closing argument. As noted above, the solicitor's life history comparison set forth in the year-by-year chronology contained the following facts relating to Humphries: (1) he "committed two house break-ins at age 13"; (2) in 1986 he violated the terms of his probation and was "sent down to Columbia"; and (3) in 1988 he went to prison for two years. Earlier, however, the solicitor had mentioned that Humphries had, at age thirteen, "committed two breaking and enterings" and was placed on probation. The solicitor pointed out that, because Humphries continued to be disobedient in school, he was brought before the family court on a probation violation and was released with stricter conditions imposed. The solicitor added that, at age fifteen, Humphries violated the terms of his probation and was "sent down to Columbia." The solicitor also proffered that, at age sixteen, Humphries was "an habitual truant," who "basically drop[ped] out of school." The solicitor further noted that, at age seventeen, Humphries burglarized a church. The solicitor noted that, at age eighteen, Humphries went to Alabama and committed a larceny for which he was convicted and imprisoned for two years. Finally, the solicitor noted that, upon his release, Humphries failed to report to the probation office, a warrant was issued, and within a couple of years of his release from prison he committed the murder at issue. Because all of the facts concerning Humphries referred to by the solicitor in his year-by-year chronology were facts recounted in greater detail earlier in his closing argument, it is difficult to conclude that the South Carolina Supreme Court acted unreasonably when it concluded that Humphries was not in any way prejudiced by the portion of the solicitor's argument related to the unique character of Dickie Smith.

Fourth, Humphries's attack on the three statements made by the solicitor near the end of the solicitor's argument misses the mark. The statements were proper argument because the statements simply asked the jury to focus on Dickie Smith's uniqueness. Unquestionably, the solicitor was entitled to argue that Dickie Smith was unique. Moreover, the solicitor equally was entitled to ask the jury to "look" at Dickie Smith's uniqueness and to ask the jury to consider the consequences of "when" a person of Dickie Smith's uniqueness is "taken."[6]

Fifth, the evidence in this case concerning the appropriate sentence was not close. The evidence showed that, after Humphries and Eddie Blackwell entered the Max-Saver convenience store, Dickie Smith asked Humphries whether he wanted something hot, and Humphries flashed a stolen gun and replied that he wanted money. While there was evidence that Dickie Smith reached under a counter as though to pull out a gun, Humphries shot Dickie Smith in the head, killing him. This evidence clearly supported the aggravating factor in the case, that the murder was committed during the commission of a robbery while Humphries was armed with a deadly weapon. The evidence in mitigation proffered by Humphries to counteract the evidence in aggravation was carefully and meticulously attacked by the solicitor. Moreover, that Dickie Smith was a unique person is not subject to serious debate. In short, we harbor no doubt that, notwithstanding the solicitor's comparison that Humphries finds so objectionable, a sentence of death would have resulted.

Sixth, the reasonableness of the South Carolina Supreme Court's decision in this case becomes more evident when one examines that court's recent decision in *Hall v. Catoe*, 601 S.E.2d 335 (S.C. 2004).

---

[6]We note that a consequence of *Payne* is that a defendant can be put to death for the murder of a person more "unique" than another, even though the defendant is, in fact, unaware of the victim's uniqueness. This does give us some pause for concern, as does the notion that, under *Payne*, a sentence of death can turn on the severity of the harm caused to the victim's family and society, even though the defendant did not know the victim or the victim's family. However, these are inevitable consequences of *Payne*'s comparative framework; a framework that we, as judges of an inferior court, are without liberty to change.

In *Hall*, the solicitor directed the jury to weigh the *worth* of Hall's life against the lives of Hall's victims:

> I am talking about values, because a jury verdict is a statement of values. And I am not talking about dollars and cents as far as what the [lives of the two girls were] worth, but nevertheless it is a question of values. What are the lives of these two girls worth? Are they worth the life of this man, the psychopath, this killer who stabs and stabs and kills, and rapes and kidnaps.

*Id.* at 339. Hall argued that his trial counsel's failure to object allowed "the solicitor to charge the jury with an arbitrary, misconceived sentencing analysis," violating his right to due process. *Id.* The South Carolina Supreme Court agreed.

Applying *Payne*, the South Carolina Supreme Court held that the *Hall* case was distinguishable from the *Humphries* case:

> In *Humphries* we recognized that it is more prejudicial for the state to compare the worth of the life of the defendant with that of his victim than it is to compare their lives based on the evidence presented. . . . In the present case, the solicitor not only suggested that Hall's life was worth less than his victims', he developed an arbitrary formula whereby if the jury finds Hall's life worth less than his victims', then the jury could reach no other conclusion than that the death penalty is justified.
>
> Further, while the solicitor in *Humphries* compared the histories of Humphries's and his victim's lives, the solicitor in *Hall* asked the jury to compare the worth of Hall's life with that of his victims'.

*Id.* at 341.

In our view, the *Hall* court gave a principled explanation of why the circumstances of *Hall* were distinguishable from those involved in our case. The *Hall* court indicated that *Hall* involved a direct

"value" comparison between the defendant and the victim, asking the jury to weigh the relative worth of the defendant and the victim. This comparison, the court concluded, rendered Hall's trial fundamentally unfair. By contrast, the court concluded that the solicitor in *Humphries* simply compared the "histories" of the defendant and the victim's lives "based on the evidence presented," *id.*, and thus, Humphries's trial was not fundamentally unfair. In essence, the court in *Hall* evaluated the role that the solicitor's argument played in both *Hall* and *Humphries* and reasonably concluded one was constitutionally proper and the other was not.

Finally, the reasonableness of the South Carolina Supreme Court's decision in this case is illustrated by examining the words of the *Payne* case itself. *Payne* tells us that states have a legitimate interest in introducing evidence of a victim's personal characteristics and evidence of the harm caused to the victim's family and society by the defendant's actions to counteract the mitigating evidence presented by the defendant. 501 U.S. at 825. The *Payne* Court was quite explicit in this regard when it stated that the "State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to this family." *Id.* (citation and internal quotation marks omitted). Whether the victim-impact evidence counteracts the defendant's mitigating evidence is a question, asking the jury to make a *comparison* between the victim-impact evidence and the defendant's mitigating evidence. In this case, in determining the appropriate sentence, the jury was asked to consider Dickie Smith's personal characteristics, the harm caused to his family and society by Humphries's actions, and Humphries's mitigating evidence, which included evidence of Humphries's personal characteristics, both favorable and unfavorable. Under these circumstances, it was reasonable for the South Carolina Supreme Court to conclude that the solicitor's life history comparison contained in his year-by-year chronology and the solicitor's other comments concerning Dickie Smith's uniqueness were within the boundaries of a question the jury was required to consider—the blameworthiness of Humphries.

D

While paying lip service to the correct standard of review, which we all seem to agree presents Humphries with an extremely difficult hurdle to overcome, the dissent in this case simply does not apply it. For if it did, it most assuredly would reach a different result. An analysis of the dissent makes this point pellucid.

The dissent begins by characterizing the solicitor's closing argument as one in which the solicitor asked for a death sentence because Dickie Smith's life was worth more than Humphries's life. The dissent tells us how the solicitor's "climactical flourish," *post* at 65, "baldly compared the general worth of the victim's existence with that of the defendant and urged the jury to impose a death penalty," *post* at 46, because Dickie Smith's life was worth more than Humphries's life. In characterizing the solicitor's argument in this light, the dissent improperly ignores the fact that the South Carolina Supreme Court determined that the solicitor's argument did not involve a comparison of the relative worth of the lives of Dickie Smith and Humphries. Under § 2254, our duty is not to determine in the first instance if the solicitor's argument involved a relative worth comparison, but rather to decide whether the South Carolina Supreme Court was unreasonable when it determined that the solicitor's argument did not involve such a comparison. The dissent utterly fails to carry out this duty.

Before turning its attention to *Payne*, the dissent criticizes us for our inability "to point to no other argument that even approaches the egregiousness of this prosecutor's comments and no other case in which a court has tolerated such misconduct." *Post* at 47. In serving up this critique, the dissent proceeds to discuss several state cases which have addressed *Payne*. Obviously, our review under § 2254 does not require us to find or rely on a state case which has upheld a similar prosecutorial argument. Rather, our standard of review simply asks us to determine whether the South Carolina Supreme Court unreasonably applied clearly established *United States Supreme Court* precedent.[7]

---

[7]Even if we have to accept the dissent's distorted invitation to cite precedent other than clearly established Supreme Court precedent, cases

Next, the dissent turns its attention to *Payne*. According to the dissent, *Payne* specifically holds that *all* comparative worth arguments are unconstitutional. The fallacies in the dissent's interpretation of *Payne* are obvious.

The *Payne* Court did not hold that *all* comparative worth arguments are unconstitutional. At most, the *Payne* Court disapproved of comparisons between the victim and other victims of society. 501 U.S. at 823. Indeed, the Court's only relevant reference to comparative worth arguments is the following:

> Payne echoes the concern voiced in *Booth*'s case that the admission of victim impact evidence permits a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy. . . . As a general matter, however, victim impact evidence *is not offered to encourage comparative judgments of this kind*—for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not.

*Id.* (emphasis added). Thus, the *Payne* Court was careful to note that victim-impact evidence is not offered to encourage comparative judgments involving the victim and other victims in society. More importantly, the *Payne* Court did not disapprove of comparisons between

---

more egregious than the one before this court do exist. For example, in *State v. Haselden*, the prosecutor told the jury that "[i]f you let this murderer walk out of this courtroom with his life then you are saying that his life is worth more than [the victim's] life." 577 S.E.2d 594, 610 (N.C.), *cert. denied*, 540 U.S. 988 (2003). The *Haselden* court upheld this argument under *Payne* because the argument: (1) "simply reminded the jury that in addition to considering defendant's life, the jury should also consider the life of the victim"; and (2) "was a natural and proper extension of the prosecutor's earlier argument concerning victim impact evidence." *Id.* Thus, the *Haselden* court upheld the prosecutor's argument even though, unlike this case, the prosecutor *explicitly* and unmistakably *implored* the jury to weigh the *comparative worth* of the defendant and his victim.

the defendant and the victim.[8] In view of this, it is inconceivable to conclude that the South Carolina Supreme Court unreasonably applied *Payne*.

The dissent also tells us that a search of the *Payne* opinion "for any indication that the Court meant to condone" comparative worth arguments would be "in vain." *Post* at 56. However, our task under § 2254 is not to determine whether *Payne* condones some, or even all, comparative worth arguments; rather, our task is to determine whether the South Carolina Supreme Court was unreasonable when it determined that *Payne* did not prohibit victim-to-defendant comparisons and whether the court was unreasonable when it determined that the solicitor's closing argument did not render Humphries's trial fundamentally unfair.

Moreover, the *Payne* Court recognized that some comparisons would be made between the defendant and the victim. 501 U.S. at 825. Indeed, the *Payne* Court noted that the "State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to this family." *Id.* (citation and internal quotation marks omitted). Obviously, it was reasonable for the South Carolina Supreme Court to conclude that, to counteract Humphries's mitigating evidence, the solicitor was allowed to introduce evidence concerning Dickie Smith's uniqueness and the actions Humphries chose to take during the course of his life.

When all is said and done, the issue before this court is unmistakably narrow. The issue is not whether we think all comparative worth

---

[8]In view of the framework established in *Payne*, the *Payne* Court's decision to refrain from commenting on victim-to-defendant comparisons is easily understood. A victim-to-victim comparison is more pernicious than a victim-to-defendant comparison because, not only does it invite a commentary on collateral evidence not properly before the jury (the worthiness of other members (victims) of society), it does not counteract the defendant's mitigating evidence, which was one of the main goals of *Payne*.

arguments are unconstitutional or only those involving victim-to-victim comparisons. Nor are we called upon to determine if there are shortcomings in the *Payne* framework.[9] Finally, whether our faithful application of § 2254 leads us on the path toward "totalitarian[ism]," *post* at 66, obviously is, as a politically philosophical proposition, beside the point. We, as an inferior court, simply are not at liberty to ignore our solemn constitutional responsibility to faithfully apply the law by converting the applicable deferential § 2254 standard of review to the *de novo* standard, as the dissent, through legal alchemy, necessarily does throughout its opinion. Put simply, because the South Carolina Supreme Court identified the correct legal standard from the Supreme Court's decision in *Payne*, we must decide whether the South Carolina Supreme Court unreasonably applied the *Payne* decision. *Williams v. Taylor*, 529 U.S. at 413. In this case, the South Carolina Supreme Court thoroughly explained why it concluded that the solicitor's comparison of Humphries's life to that of Dickie Smith's did not render Humphries's trial fundamentally unfair. We know from our review of *Payne* and other relevant Supreme Court authority that comparisons between the defendant and the victim are inevitable in any capital case in which the jury is asked to assess the persuasive force of the defendant's mitigating evidence and the victim-impact evidence. Some comparisons, such as those based on race or religion, unquestionably are unconstitutional. *See Zant v. Stephens*, 462 U.S. 862, 865 (1983) (noting that a defendant's race and/or religion are "totally irrelevant" to the sentencing process). Other comparisons are not. The South Carolina Supreme Court was required to decide if the solicitor's comparison of Humphries's life history to Dickie Smith's life history was violative of the dictates of *Payne*. After reviewing that court's thorough opinion, we simply can-

---

[9]Arguably, *Payne* has a few shortcomings. For example, a consequence of *Payne* is that a defendant can be put to death for the murder of a person more "unique" than another, even though the defendant was, in fact, unaware of the victim's uniqueness at the time of the crime. Also, under *Payne*, a sentence of death can turn on the severity of the harm caused to the victim's family and society, even though the defendant did not know the victim or the victim's family. Whether we agree or disagree with these consequences simply is beside the point. These consequences are inevitable under the *Payne* framework; a framework that we, as judges of an inferior court, are without liberty to change.

not conclude that the South Carolina Supreme Court *unreasonably* applied the *Payne* decision.

IV

Humphries also claims that the State's failure to notify him prior to trial of the State's intended use of victim-impact evidence during the sentencing phase of the trial violated his right to a fair trial under the Due Process Clause of the Fourteenth Amendment. On direct appeal, the South Carolina Supreme Court rejected this claim.

Humphries first posits that his trial counsel reasonably believed that South Carolina Code § 16-3-20(B) entitled the defense to receive pre-trial written notice of the aggravating factors that would be used at the sentencing phase of the trial, which implicitly included victim-impact evidence. According to Humphries, his trial counsel did not receive pre-trial notice of the intended use of victim-impact evidence and, had such notice been given, his trial counsel would have used different trial tactics, including, among other things, selecting jurors differently and reconfiguring an expert witness's testimony. Humphries suggests that the State's failure to comply with § 16-3-20(B) violated his federal due process rights.

For several reasons, Humphries's reliance on § 16-3-20(B) is misplaced. First, Humphries is raising an issue of state law, which is not cognizable on federal habeas review. *Cf. Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."). Second, the statute at issue does not require that notice of the use of victim-impact evidence be given. South Carolina Code § 16-3-20(B) provides that at the sentencing phase of the trial "[o]nly such evidence in aggravation as the State has informed the defendant in writing before the trial is admissible." S.C. Code Ann. § 16-3-20(B). The South Carolina Supreme Court on direct appeal noted that the statute lists certain aggravating factors requiring notice. *Humphries*, 479 S.E.2d at 55. Because victim-impact evidence is not listed as an aggravating factor, the State is not required to give notice. *Id.* Finally, even if the statute did require pre-trial notice, Humphries received pre-trial written notice that the State intended to introduce certain facts in evidence including all circumstances surrounding the commission of the crimes. In its witness lists, the State listed the

victim-impact witnesses and, moreover, the State asserted that it had informed the defense that it would present victim-impact evidence during the sentencing phase of the trial. While the pre-trial notice could certainly have been more explicit concerning the planned introduction of victim-impact evidence, unquestionably, the State was not obligated under § 16-3-20(B) to detail the victim-impact evidence with greater specificity.

In a related argument, Humphries claims that his due process rights were violated because his death sentence "was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." *Gardner*, 430 U.S. at 362. According to Humphries, he did not receive adequate notice concerning the introduction of victim-impact evidence and, therefore, could not adequately prepare his defense in advance. This claim founders for the simple reason that Humphries knew or reasonably should have known that victim-impact evidence would be used by the State during the sentencing phase of the trial. Therefore, he had ample opportunity to investigate and rebut that evidence. Indeed, there is no law that clearly requires timely, specific, and express notice of victim-impact evidence, and Humphries can point to no relevant federal authority to substantiate his claim. Thus, the South Carolina Supreme Court reasonably interpreted federal law to find that the admission of victim-impact evidence did not violate Humphries's right to a fair trial under the Due Process Clause of the Fourteenth Amendment.

V

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED*

LUTTIG, Circuit Judge, concurring:

The full *en banc* court ignores the dissent's caricatures of both the question of law presented and the facts giving rise to that question, and properly decides the issue before us on the basis of the governing legal standards and the actual facts as they appear in the record. I concur in the judgment reached by the court and in its opinion.

Although the need should not have presented itself, suffice it to say that this is not a case even remotely about "the hallmarks of totalitarian governments," *post* at 66 (Wilkinson, J., dissenting). It does not concern "the most terrifying regimes of the Twentieth Century" or anything approaching such. *Id*. And it is not a case that bears mention alongside "the most terrible examples of human expendability." *Id*. Even to suggest these comparisons trivializes the historical events and the victims of those events to which the dissent invokes reference.

This case does not invite us to "set foot on a road Americans will not recognize and our Constitution will not tolerate," *id*. And by denying Humphries' petition on the grounds that the majority correctly does is not in any sense whatsoever to "sanction executions on the basis of extended weighings of relative human worth," *id*. at 51, or to "condon[e] egregious human worth comparisons," *id*. at 52, of the most "horrific sort," *id*. at 50. Such hyperbole only betrays the fact that the dissent has chosen (as did the panel, mistakenly as well) to address itself to a question of law and to a set of facts that are not even arguably before the court.

To decide this case, we do not need to plumb the "anciently established principles" of federal law, *see id*. at 46, nor must we "ascend to this register" of "sentencing philosophy" and its "seminal concepts" at "a high level of generality," *see id*. at 58-59. And neither are we invited or required to conduct a far-reaching "survey[  of] American sentencing practice" and "historic sentencing procedure," *id*. at 60, 65. Tellingly, not even the dissent undertakes in actual analysis anything of the sort.

We have before us, instead, a rather straightforward question of law, one as to which our scope of review, as a court of law, is clearly and narrowly circumscribed by congressional enactment and binding Supreme Court precedent. *Contrary to the dissent's characterization, we do not even have before us, as we would on direct appeal of a case in which an explicit human worth comparison were made, the question of whether it would violate the Constitution for the government to resort to such comparisons in appealing for a higher sentence of one convicted of crime.* Before us is nothing less, but nothing more either, than an ineffective assistance of counsel claim under *Strickland* v. *Washington*, raised on collateral review of a state court judg-

ment that fully considered that claim. As such, the precise question of law with which we are confronted is whether, within the meaning of 28 U.S.C. § 2254, it was contrary to or an unreasonable application of clearly established holdings of the Supreme Court of the United States for the South Carolina state court to conclude that Humphries' counsel at sentencing were not constitutionally ineffective under *Strickland* for failing to object to the portion of the state solicitor's argument that allegedly violated *Payne* v. *Tennessee*, 501 U.S. 808 (1991).

The dissent is at pains to avoid even as much as the articulation of this narrow legal question because its precise articulation draws into stark focus not only the dissent's exaggeration of the question presented, but, ultimately, the indefensibility of the dissent under the legal standards that govern disposition of this case.

Because of the particular posture of this case, we are required to accord extraordinary deference to trial counsel's failure to object. First, as the dissent concedes, *Strickland* requires the state court and this court to treat with great deference trial counsel's real-time decisions with respect to objections at trial. Second, as the dissent also concedes, section 2254(d) requires us to defer to the state court's application of *Strickland*. Thus, the great deference owed to trial counsel's contemporaneous decisions implicating trial strategy is *compounded* on collateral review, where we are to defer to the state court's highly deferential review of these decisions. Furthermore, under AEDPA, we are bound to uphold the judgment of the state court unless it was unreasonable in its application of *both Strickland and Payne*, not just the one or the other. And on top of all this, the chief case upon which the dissent relies, namely *Payne*, does not even address the issue presented in this case — namely victim-to-defendant value comparisons — thus making it utterly implausible to suggest that the South Carolina court's treatment of that case constituted an unreasonable application of any *clearly established* holding in *Payne*.

In short, we are reviewing with substantial deference the state court's application of the clearly established holdings of two cases, *Strickland* and *Payne*. Even if, under such deference, we were to conclude that the state court erred in its understanding of the holding and/or application of *Payne*, in order to grant Humphries' petition we

would still have to conclude that, under the same deference, the state court erred in its application of *Strickland* — which itself requires the state court to defer to trial counsel. Therefore, we face the following four, separate, plainly valid, alternative grounds compelling affirmance of the denial of Humphries' petition: (1) it was not contrary to or an unreasonable application of *Payne* for South Carolina to hold that *Payne* erects no *per se* bar against victim-to-defendant value comparisons, because *Payne* does not address that issue at all; (2) even if *Payne* did address such comparisons, it was not an unreasonable application of *Payne* for South Carolina to conclude that no such human-worth comparison occurred in this case; (3) even if such were an unreasonable application of *Payne*, it would not be an unreasonable application of *Strickland* for South Carolina to conclude that counsel's failure to object did not constitute objectively unreasonable performance; and (4) even if failure to object were an unreasonable application of *Strickland*, it was nevertheless not an unreasonable application of *Strickland* for South Carolina to conclude that Humphries was not prejudiced by counsel's failure to object. Each of these four grounds is individually compelling and each is individually sufficient to compel affirmance in this case. Because, as a consequence of its exaggeration, the dissent fails to effectively address *any* of these four grounds, much less all of them, its errors are compounded across multiple layers of the required legal analysis.

A.

As Humphries concedes, in order to prevail on his *Strickland* claim premised on counsel's failure to object, he must first establish that what occurred at trial without objection was improper, illegal, or unconstitutional. *See Appellant's Br.* at 12-13. Humphries argues and the dissent urges that the four brief references to Humphries during the solicitor's narrative of Dickie Smith's life created an objectionable person-to-person value comparison in violation of *Payne*. On post-conviction review, the South Carolina Supreme Court held, *inter alia*, that victim-to-defendant value comparisons were not clearly unconstitutional because "*Payne* does not indicate any concern about comparisons between the victim and the defendant." *Humphries* v. *State*, 570 S.E.2d 160, 167 (S.C. 2002) ("*Humphries II*"). Our task in this habeas proceeding is to determine whether this state-court ruling was "contrary to, or involved an unreasonable application of" the

*holding* (rather than the dicta) of *Payne*. 28 U.S.C. § 2254(d)(1); *Williams* v. *Taylor*, 529 U.S. 362, 412 (2000) (holding that the phrase "clearly established federal law in section 2254(d)(1) refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision").

Plainly it was not, because *Payne* never once even mentions victim-to-defendant value comparisons. Humphries' claim thus falters at its very first step. On our strictly circumscribed review of Humphries' state-court conviction, this elementary observation is sufficient to dispose of the petition, because, as a threshold matter, Humphries was required to show in state court that the challenged portion of the argument was unconstitutional.*

Nevertheless, the dissent raises three flatly untenable arguments that *Payne* somehow clearly established "the ban on such comparisons" as its holding — without even mentioning such comparisons. *Post* at 46. First, the dissent argues that, because *Payne* does not explicitly condone human-worth comparisons, it thereby condemns them. *See post* at 56 ("Notably absent from the Court's discussion is any hint of imprimatur for human worth comparisons. . . . Indeed, one searches the *Payne* opinion in vain for any indication that the Court meant to condone such comparative judgments."). But, of course, under law we do not ascertain the *holding* of a case by inquiring into what is *absent* from the Court's discussion. Rather, the *holding* of a case is found in what is actually *present* in the Court's discussion. The dissent's "negative inference" approach to Supreme Court prece-

---

*\*Payne* does explicitly state (though not in holding) that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne*, 501 U.S. at 825 (citing *Darden* v. *Wainwright*, 477 U.S. 168, 179-83 (1986)). Given that *Payne* erects no *per se* bar against value comparisons, and given that the solicitor's use of victim-impact evidence in this case was apparently otherwise unobjectionable, it was clearly not contrary to or an unreasonable application of *Darden* for South Carolina to conclude that Humphries' trial was not rendered fundamentally unfair by the brief challenged portion of the solicitor's argument. *See Humphries II*, 570 S.E.2d at 167-68. Thus, for the reasons discussed thoroughly by the majority, *Darden* likewise fails to provide Humphries with any avenue of relief.

dent would find reversible error in every trial argument of the slightest novelty as-yet unaddressed by the Court — turning AEDPA on its head.

Second, the dissent references the following passage as its sole evidence from the text of *Payne* that *Payne* "condemn[ed]" human-worth comparisons:

> Payne echoes the concern voiced in *Booth*'s case that the admission of victim impact evidence permits a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy. As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind — for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead *each* victim's uniqueness as an individual human being . . . .

*Payne*, 501 U.S. at 823 (emphasis in original) (citation and quotation marks omitted). As an initial matter, the dissent's treatment of this text from *Payne* is disingenuous, in a way that exactly mirrors the error of the vacated panel opinion. *Compare post* at 56 *with Humphries* v. *Ozmint*, 366 F.3d 266, 272 (4th Cir. 2004). In particular, both the dissent and the panel opinion introduce the "concern" about victim-to-victim value comparisons as if it were *the Court's* concern, instead of a concern raised by *the litigant*. Then, both proceed to quote the sentence beginning "[a]s a general matter" out of context, *omitting the key word "however"* that denotes *contrast* between the concern raised *by the litigant* and *the Court's* subsequent remark — thereby twisting the Court's language to imply that the Court was *expressing explicit disapproval* of such value comparisons in this passage. *See post* at 56 (arguing that the Court "professes incredulity" about victim-to-victim value comparisons in this passage, and that it thus "signals a clear disapproval for the kind of interpersonal comparison that occurred here"). Of course, as is plain from the text quoted fully above, the passage says something quite different than the dissent's tortured quotation would suggest. In this key passage, the Court simply (1) noted that *the litigant* Payne had raised a concern about

value comparisons, and then (2) made a normatively *neutral* observation that, *in contrast to this concern*, victim impact evidence is not generally admitted for such purposes. Therefore, this key passage — the *only* passage from *Payne* upon which the dissent can possibly rely — does not "condemn" or otherwise express disapproval of any human-value comparisons at all; and, needless to say, neither did the Court, through this passage, "profess incredulity" at such comparisons. Instead, it simply makes the neutral observation that the general purpose of victim-impact evidence is not to create victim-to-victim comparisons.

Moreover, even if this passage from *Payne* did express disapproval of value comparisons, it would nevertheless be inadequate for the dissent's purposes for three further reasons. First, as the South Carolina court held, the passage addresses only *victim-to-victim* value comparisons, not *victim-to-defendant* value comparisons, and therefore does not establish a bar against (or otherwise comment upon) the latter. *See Humphries II*, 570 S.E.2d at 375 ("According to this passage, the comparison prohibited by *Payne* is one between the victim and other members of society; *Payne* does not indicate any concern about comparisons between the victim and the defendant."). Second, because there was apparently no allegation in *Payne* that any victim-to-victim value comparison had been made, the passage is clearly in dicta, not in holding, and thus irrelevant under AEDPA. *See Williams*, 529 U.S. at 412; *United States* v. *Washington*, No. 03-4867, Slip op. at ___ (4th Cir. 2005) ("[T]he *holding* . . . is limited to sets of facts that are materially indistinguishable from the facts before the court in that case." (emphasis in original)). Third, in addition to all this, we are reviewing the South Carolina court's interpretation of this passage under the deferential "unreasonable application" standard of section 2254(d)(1). *See Williams* v. *Taylor*, 529 U.S. at 411 ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."); *see also Booth-El* v. *Nuth*, 288 F.3d 571, 575-76 (4th Cir. 2002) (Wilkinson, C.J.) ("The Court has stressed that, in section 2254(d)(1), Congress specifically used the word 'unreasonable,' and not a term like 'erroneous' or 'incorrect.'" (alteration and quotation marks omitted)). Patently, under this standard and in light of this evidence, it was not *unreasonable* for South

Carolina to conclude that *Payne* erected no *per se* bar to victim-to-defendant value comparisons.

Finally, in a virtual concession that the language of *Payne* provides no basis for its argument, the dissent grasps at lofty abstractions in an attempt to salvage its position. Turning from its self-described "textual dissection" of *Payne*, which actually includes virtually no reference to the text of *Payne*, the dissent appeals to "an overview of *Payne* and its sentencing philosophy," admittedly "ascending to th[e] register" of "a high level of generality." *Post* at 58. That the dissent must reference such ethereal concepts as the "overview" and "sentencing philosophy" of *Payne* to support its argument effectively demonstrates, not only that *Payne* did not *clearly establish* in holding a rule against human-worth comparisons, but also, and even more certainly, that it was not *unreasonable* under section 2254(d)(1) for South Carolina to so conclude.

Because South Carolina was not even arguably unreasonable in determining that *Payne* did not establish a *per se* rule against victim-to-defendant value comparisons, Humphries' *Strickland* claim fails on this ground alone.

But Humphries' claim fails on three other compelling grounds as well.

## B.

Even if *Payne* had clearly established, in holding, a *per se* rule against victim-to-defendant value comparisons (which it plainly did not), South Carolina's determination that no such human-worth comparison occurred here would not be an "unreasonable application" of *Payne*. *See Humphries II*, 570 S.E.2d at 374 ("We agree with the PCR court's finding that the solicitor's argument does not suggest that Smith's life is *worth more* than the Petitioner's life." (emphasis in original)).

The challenged portion of the solicitor's argument consists primarily of the following three sentences, interspersed in the solicitor's summation of Dickie Smith's life history: "That's the same year

Shawn Paul Humphries committed two house break-ins at age 13. . . . That's the same year Shawn Paul Humphries is up for his second probation violation and sent down to Columbia. . . . That's the same year Shawn Paul Humphries went to jail for two years." J.A. 107. The solicitor thus juxtaposed positive and happy events in the victim's life — his marriage, his decision to start a homebuilding business, and the birth of his daughter — with contemporaneous misdeeds in Humphries' life. J.A. 107.

The dissent contends that the only possible purpose and effect of such a juxtaposition was to convey the conclusion that Humphries' life was worth less than Dickie Smith's life. *See post* at 49-50 ("The solicitor's comparisons simply leave no room for explanations of inadvertence, or of an unintentional verbalization of an errant train of thought. . . . Rather, the prosecution sought point-by-point, side-by-side, and year-by-year to demonstrate to the jury that at the very instant one life was being put to worthwhile use, the other was not."). But of course it does not follow that, because the references to Humphries were not inadvertent, they must have deliberately created a human-worth comparison. On the contrary, the apparent purpose and effect of the solicitor's references to Humphries was to deflate the exculpatory version of Humphries' life history presented by the defense — which was the prosecution's main task at the sentencing hearing, a task openly endorsed by *Payne*.

By far, the bulk of the sentencing hearing and the bulk of the solicitor's closing argument were concerned with the defense's attempt to present an exculpatory story about Humphries' culpability for the murder by portraying the hardships of Humphries' past life. The defense attempted to show that Humphries' moral guilt for the murder was attenuated due to the misfortunes of his past: poverty, parental abuse, drugs and alcohol, and juvenile crimes and punishment. To this end, the defense presented *thirteen* witnesses in mitigation — as compared to the two victim-impact witnesses that the prosecution offered. In his closing argument, the solicitor's discussion of this issue of Humphries' culpability spans *twelve* full pages of the transcript — as compared to the three and a half pages devoted to the narrative of Dickie Smith's life. *Compare* J.A. 92-104 *with* J.A. 105-08. The dominant theme of the solicitor's argument was that, despite the hardships he faced in his childhood and youth, Humphries still bore moral

responsibility for his choices. The following excerpt summarizes his twelve-page discussion of Humphries' personal culpability:

> A lot of people come from broken homes. A lot of people come from single parent homes. Dickie Smith came from a single parent home. Ashley Smith is now from a single parent home. If everybody who came from a single parent home or a blended family or a home with violence, if every person went out and murdered, we couldn't fill this jury box with people.

> There's no question [Humphries'] daddy was violent. There's no question violence is a learned behavior. . . .

> And that's a problem in America. There's no question about it, but violence as a learned behavior does not come close to explaining what happened here. It just doesn't do it.

> . . . Violence as a learned behavior does not explain larceny. Violence as a learned behavior does not explain evil malice killing. Simply doesn't do it.

. . . That's the mitigation that they're throwing at you. That's the crux of the defense.

> Why is it the crux of the defense? Because you've got an aggravated, senseless killing. No question about it. And you've got a kid who's been in trouble since he was 13, horrible record.

> So the only thing that is left is to try to take this alcohol use and marijuana use, and poverty background and sort of bootstrap yourself up into some sort of mental mitigation. And I would submit to you that it fails horribly.

J.A. 100-01, 103. Like the reference to Dickie Smith in the above passage, the challenged references to Humphries in the solicitor's brief narrative of Dickie Smith's life underlined the main theme of the solicitor's whole argument, namely that Humphries should bear moral

responsibility for the choices he made. Both references, by contrast-ing the two men, suggest that Humphries *could have made* other choices that he did not make. Like Dickie Smith, Humphries *could have* chosen to build houses in spite of the adversity he faced; instead, he chose to break into houses. *Compare post* at 60 ("That Dickie Smith happened to be building houses while Shawn Paul Humphries happened to be breaking into houses is a judgment freighted with comparative moral import."). Because Humphries could have made better choices, including the choice not to kill Dickie Smith, he should be held morally accountable for his actions, despite the defense's attempt to argue that the difficulties of Humphries' life exculpated Humphries for the murder of Dickie Smith. Such was the tenor of the solicitor's argument, and the clearest import of the con-trasting references to events in Humphries' and Dickie Smith's lives. To say that Humphries and Dickie Smith are both morally responsible for their choices is *not* to say that Smith's life was "worth more" than Humphries or that Smith was a "more valuable person" than Humph-ries.

Clearly, the solicitor's argument about Humphries' moral account-ability, and his use of victim-impact evidence to highlight it, were unobjectionable under *Payne*. The *Payne* Court openly countenanced the juxtaposition of victim-impact evidence with the defense's evi-dence in mitigation for the purpose of deflating the exculpatory life story presented at sentencing by many capital defendants:

> [T]he state has a legitimate interest in counteracting the mit-igating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individ-ual whose death represents a unique loss to society and in particular to his family.

*Payne*, 501 U.S. at 825 (alteration in original) (quotation marks and citation omitted). Here, the solicitor used victim-impact evidence to "counteract the mitigating evidence" presented by the defendant by suggesting that the unfortunate circumstances of Humphries' back-ground did not absolve him of moral responsibility for his crimes. Thus, on the most natural reading of the solicitor's argument, the challenged portion did not constitute a human-worth comparison at

all. Rather, it was a statement by contrast of the defendant's moral accountability for his actions. Therefore, it was not an unreasonable application of *Payne* for South Carolina to determine that, even if *Payne* did bar victim-to-defendant value comparisons, no such value comparison occurred in this case.

The dissent's highly imaginative re-dramatization of the solicitor's argument from that in the printed appellate record thus misses the mark. *See post* at 50, 51, 65 ("comparisons . . . took on the air of a refrain"; "concluding flourish"; "the affective qualities of the oratory"; "the piece-de-resistance"; "build[ing] inexorably towards this apex"; "the plaintive repetition . . . in his ultimate exhortation"; "a climactical flourish"). At bottom, the dissent's argument must rest entirely on the speculative assumption that the solicitor's juxtaposition of events in fact *implied* such a human-worth comparison to the jury. If so, the implication was indirect and not implied *necessarily* at all: to say that two people from unfortunate circumstances should bear moral responsibility for the good and bad choices that they make simply is *not* to say that one is more *valuable* than the other.)

### C.

Third, even if South Carolina had erred in its treatment or application of *Payne*, we could not hold that it would be unreasonable for South Carolina to determine that trial counsel's failure to object nevertheless constituted constitutionally acceptable performance under *Strickland*. As noted above, here we owe compounded deference to trial counsel's decision: we defer to the South Carolina court's highly deferential review of trial counsel's performance. And the deference that trial counsel must be afforded under *Strickland* is appropriately extensive, because appellate courts are poorly suited to second-guess trial strategy and on-the-fly decisions of trial counsel. *See Strickland v. Washington*, 466 U.S. 668, 689 (1984) ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."). Indeed, it is well established that failure to object to inadmissible or objectionable material for tactical reasons can constitute objectively reasonable trial strategy under *Strickland*. *See*, *e.g.*, *Booth-El* v. *Nuth*, 288 F.3d 571,

584 (4th Cir. 2002) (Wilkinson, C.J.) (counsel's failure to object to objectionable jury panel that may have been favorable for other reasons was not objectively unreasonable) ("Defense counsel made a tactical decision to preserve the jury that had already been selected."); *Spicer* v. *Roxbury Corr. Inst.*, 194 F.3d 547, 562 (4th Cir. 1999) (opinion joined by Wilkinson, C.J.) (counsel's failure to object at trial to the testimony of an eyewitness was not objectively unreasonable because counsel may have preferred cross-examination to exclusion of the witness); *Arnold* v. *Evatt*, 113 F.3d 1352 (4th Cir. 1997) (failure to object at trial to evidence discrediting a witness' testimony could reasonably have been part of a trial strategy).

In this case, even if *Payne* clearly established a rule against victim-to-defendant human-worth comparisons and even if the solicitor had clearly made such a comparison, it would not constitute an unreasonable application of *Strickland* for South Carolina to conclude that Humphries' counsel were not constitutionally ineffective for failing to object. After all, the allegedly objectionable portion of the solicitor's argument was quite brief. An objectively adequate defense attorney might easily have judged that he would lose face with the jury by posing an objection that caviled at an emotionally charged point in the argument, and that this harm might outweigh any benefit to his client from having a few sentences stricken from the record. Indeed, given that there was no clearly established law on which to rely, trial counsel may have reasonably feared that the jury would view his very probably *unsuccessful* and unjustified objection at that point as mere pettifogging — and discounted his credibility accordingly. Also, given the brief, indirect nature of the alleged comparison, an objectively reasonable attorney might even have feared that *his objection* would actually draw the jurors' minds into a human-worth comparison, rather than the solicitor's fleeting references to Humphries. After all, absent objection, the jury might well have missed the alleged significance of these references as a supposed human-worth comparison, as did the South Carolina court and the majority of judges in this circuit, all of whom are unwilling to hold that an explicit human-worth comparison occurred in this case. Likewise, a reasonable attorney might have judged that an objection at that point might have *highlighted* the solicitor's effective debunking of the exculpatory version of Humphries' life history presented by the defense.

In sum, given the deference owed to real-time, tactically significant decisions about objections made by trial counsel, it is unlikely that we could hold that trial counsel's failure to object was objectively unreasonable under *Strickland* — *even if* we were considering this *Strickland* claim in the first instance and *even if Payne* had clearly established a rule against human-worth comparisons. Considering the fact that counsel had no explicit grounds for objection under *Payne* because *Payne* does not address such comparisons, and the fact that the deference we owe trial counsel is compounded by the deference we owe South Carolina's judgment under AEDPA, it is evident that Humphries' petition must be denied on the first prong of *Strickland*.

D.

Fourth, it was not an unreasonable application of *Strickland* for South Carolina to hold that Humphries did not suffer prejudice from the challenged portion of the solicitor's argument. *See Humphries II*, 570 S.E.2d at 168 ("In our opinion, the solicitor's closing argument . . . did not prejudice Petitioner."). The challenged references were brief and referred to evidence that had been admitted into the record, submitted to the jury, and extensively commented upon earlier in the solicitor's argument. *See ante* at 21-23. Humphries bases his challenge primarily on three sentences in a twenty-eight page closing argument. All three referred fleetingly to evidence that he had discussed extensively only a few minutes before. As the majority concludes, there was no reasonable probability that the solicitor's use of those few sentences at that point changed the outcome of the proceedings. *See ante* at 23 ("[W]e harbor no doubt that, notwithstanding the solicitor's comparison that Humphries finds so objectionable, a sentence of death would have resulted."). Far less did it constitute an unreasonable application of *Strickland* for South Carolina thus to conclude.

The denial of Humphries' *Strickland* claim, thus, is independently supported by four distinct, compelling, and individually sufficient grounds for affirmance. It is for this reason that I concur in the judgment and opinion of the court.

**Volume 2 of 2**

WILKINSON, Circuit Judge, dissenting:

No person should be executed in America on the theory that his life is of less worth than that of someone else. This principle is not only clearly established in federal law; it is anciently so. Neither a defense attorney, nor a state court judge, nor his federal counterpart should need any prompting to object to a death sentence that is premised on a principle of comparative human worth. Because the majority's opinion fails to respect the ban on such comparisons, and in the process strays perilously close to endorsing them, I respectfully dissent.

There should be no doubt that this case presents a violation of this sort. The prosecutor made no bones about what he did. He baldly compared the general worth of the victim's existence with that of the defendant and urged the jury to impose a death penalty on that basis. This sort of argument should not serve as a prelude to any sort of punishment, much less to a capital sentence.

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court made clear the many good and legitimate uses of victim impact evidence. Without a doubt, victim impact evidence serves an important role in our criminal justice system. It affords a multitude of avenues for impressing on the jury the peculiar anguish of the loss from violent crime. Indeed, victim impact evidence may become more important as the severity of the offense increases. It is certainly warranted in a capital sentencing proceeding, where the loss to family and friends is most profound and where the murder has robbed the prosecution of a critical witness.

But what happened here was a perversion of all that is proper under *Payne*. Punishment in our system reflects those things for which an individual defendant is responsible, not notions of the relative value of respective human lives. The prosecutor took leave of the bedrock principle that punishment rests on the circumstances of the crime, the

consequences for its victims, and the defendant's criminal history. Rather than seek a capital sentence on these traditional and wholly defensible bases, the prosecutor strayed into territory whose forbidden nature should have been self-evident.

Indeed, the majority is able to point to no other argument that even approaches the egregiousness of this prosecutor's comments and no other case in which a court has tolerated such misconduct. There is a reason for this telling lacuna in the majority opinion — the wrongfulness of putting people to death on the basis of comparative human worth arguments is now, and was at the time of Humphries' sentencing, clearly forbidden. I would therefore affirm Humphries' conviction, but I would issue the writ for purposes of resentencing. I regret that I take such exception to the views of my distinguished colleagues and able concurring brother on this issue, but I do.*

I.

The majority's defense of the state solicitor's closing argument begins with the claim that it contains no transgression that would warrant our censure. My colleagues claim that this argument "simply did not invite the jury to return a sentence based on the relative worth of the lives of Dickie Smith and Humphries." *Maj. Op.* at 21. To support this proposition, the majority attempts to submerge the prosecutor's improper weighing of human worth at the end of his argument in the sea of legitimate evidence already before the jury. But close examination of the solicitor's final presentation to the jury betrays the futility of this apology.

The solicitor began his closing arguments at the sentencing phase by sketching the contours of the evidence he would discuss. He announced:

> You look at four things in deciding the issue of punishment. You look at the aggravation. Is it an aggravated murder?

---

*My views have not changed in any respect from those I expressed in the vacated panel opinion, *Humphries v. Ozmint*, 366 F.3d 266 (4th Cir. 2004). This dissent relies upon that opinion as supplemented by points debated during the process of en banc rehearing.

> You look at the character of the Defendant. You look at any mitigation, statutory mitigation or other mitigation they've presented to you. And the last thing you look at is the victim, his uniqueness. What harm to the community and to the victim and to the family did this Defendant cause? Those are the four things you look at.

This outline of the evidence was entirely unremarkable. Indeed, the Supreme Court has generally endorsed the propriety of each of its elements. *See, e.g.*, *Simmons v. South Carolina*, 512 U.S. 154, 163 (1994) (aggravating factors including the defendant's "prior criminal history"); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (mitigating evidence).

The prosecutor was therefore well within constitutional bounds in his exegesis of the first three sections. The trial evidence received, the witness testimony at sentencing, and the prosecution's closing argument discussed in turn the aggravating circumstances of the crime, Humphries' criminal history, and the mitigating evidence offered by the defendant. The testimony the prosecutor elicited for the final element of his presentation, concerning the victim's uniqueness, was similarly sound. Dickie Smith's relatives appeared before the jury without objection and recounted their recollections of the victim and what he had meant to each of them. Indeed, had the solicitor stopped at this juncture, his actions would have been beyond scrutiny.

The problem was that the solicitor did not stop. In his commentary on the victim impact evidence, the prosecutor took leave of his announced intention to discuss "the victim, his uniqueness" and the "harm to the community and to the victim and to the family" that the defendant's crime had caused. Instead, he launched into a general human worth comparison that could not have been more removed from his stated purpose of showing Dickie Smith as a unique and individual human being. This stark detour should have been obvious from the solicitor's first mention of the defendant in the narrative of the victim's own life:

> [I]n 1984 [Dickie Smith] met Pat, and they fell in love, and they got married. That's the same year Shawn Paul Humphries committed two house break-ins at age 13. 1986 Dickie

makes a pretty drastic move. He decides he's going to quit Kemet and go build homes full-time, and he goes out, and he starts building homes in the community he had grown up in. That's the same year Shawn Paul Humphries is up for his second probation violation and sent down to Columbia.

Then in 1988, July the 4th, they have a little baby girl named Ashley. You know, the Defense brought in a 12 year old stepdaughter — stepsister, said, "Please don't put Shawn Paul Humphries in the electric chair." I'm sorry I did not feel it was appropriate to bring in a six year old girl Ashley and parade her in front of you.

In 1988 Ashley is born. That's the same year Shawn Paul Humphries went to jail for two years. And in the spring of 1992, I believe, Dickie Smith opens the doors to the Max-Saver, building a business down in that community.

The majority claims that the solicitor meant only to foreground "Dickie Smith's uniqueness as an individual" in this part of his closing argument and contends that the vignettes from the victim's life did nothing more than further this purpose. *Maj. Op.* at 8-9, 20. The majority keeps repeating that the prosecutor's comments did not involve a human worth comparison. But it never begins to explain why not. Indeed, the majority never tells us why Shawn Paul Humphries' full name needed to occur at all — let alone three times — in the part of the closing argument that was expressly previewed to the jury as an entirely legitimate discussion of Dickie Smith as an individual human being. Because the prosecutor avoided using words such as "compare" or "value" or "worth," my colleagues also assert that this portion of his argument cannot credibly be regarded as one of comparative human worth. *Id.* at 21, 24. I cannot accept this characterization. Indeed, if this argument is not deemed to be one of comparative human worth, then I cannot conceive of an argument that would merit that designation.

The solicitor's comparisons simply leave no room for explanations of inadvertence, or of an unintentional verbalization of an errant train of thought. Indeed, such glancing or implicit comparisons may be all but unavoidable in a sentencing proceeding focused on the persons of

the victim and the perpetrator. Yet the prosecution here uttered identically-phrased comparisons for three separate occasions — comparisons that took on the air of a refrain. All of these comparisons mentioned the defendant by his full name and all employed the same dramatic construction, "[t]hat's the same year Shawn Paul Humphries . . . ." The record thus presents no general, oblique, or inadvertent comparisons of the victim and defendant. Rather, the prosecution sought point-by-point, side-by-side, and year-by-year to demonstrate to the jury that at the very instant one life was being put to worthwhile use, the other was not.

Thus, far from showing the victim as an individual, the prosecution presented two largely separate lives in tandem. In this regard, the comparison went far beyond the only two cases raised by the State that purport to reconcile *Payne* with comparative worth arguments, *State v. Haselden*, 577 S.E.2d 594, 610 (N.C. 2003), and *Jackson v. State*, 33 S.W.3d 828, 843 (Tex. Crim. App. 2000). Neither of those cases sought to advance the sort of human time chart the prosecution ventured here. Neither deliberately sought to take past events in two unrelated lives for the sole purpose of comparing the general worth of the victim's and the defendant's existence. Indeed, in *Haselden*, the case on which the majority chiefly relies, *Maj. Op.* at 26-27 n.7, the most it can muster up is a single sentence which did not begin to approach the prosecutor's extensive exploration of relative worth in the Humphries' case.

Other courts have not hesitated to censure violations of a less horrific sort than that which happened here. In *State v. Koskovich*, 776 A.2d 144 (N.J. 2001), the court held that a "directive to jurors that they balance the victim's background against that of defendant was akin to asking the jury to compare the worth of each person," which is "inherently prejudicial" and "might prompt jurors to impose the death penalty arbitrarily." *Id.* at 182. Likewise the court in *State v. Muhammad*, 678 A.2d 164 (N.J. 1996), emphasized that "[v]ictim impact testimony may not be used . . . as a means of weighing the worth of the defendant against the worth of the victim." *Id.* at 179. *State v. Storey*, 901 S.W.2d 886 (Mo. 1995) (en banc), meanwhile, found ineffective assistance of counsel in the failure to object to prosecutor's argument, "[w]hose life is more important to you? Whose life has more value? The Defendant or [the victim's]?" *Id.* at 902. And the

South Carolina Supreme Court only recently overturned a capital sentence which had been returned after a prosecutor asked the jury whether "the lives" of the victims were "worth" that of the "killer." *Hall v. Catoe*, 601 S.E.2d 335, 339 (S.C. 2004). While the prosecutor may have used the word "worth" in his argument, his comments did not rise to the level of a studied and comparative chronology of two peoples' lives, as we have before us here.

In the face of these precedents, I am surprised the majority clings to its defense of the prosecutor's peroration in this trial. For the case law leaves the majority literally alone in its willingness to sanction executions on the basis of extended weighings of relative human worth.

Any lingering doubts one might have about the State's purpose should be thoroughly dispelled by considering how the solicitor drew his comments to a close. He returned to the notion that "Dickie Smith is as much about this case as Shawn Paul Humphries" by rhetorically asking "[w]ho is the victim here, Shawn Paul Humphries or is it Dickie Smith?" He legitimately implored the jury to return a capital sentence by asking "if not in a case with a character like this, if not in a case when somebody like Dickie Smith is taken, then when are you going to do it?" It was another ending exhortation, however, that left the jury in no doubt: "[W]hen you look at the character of this Defendant, and when you look at Dickie Smith, how profane when you look at all the circumstances of this crime and of this Defendant, how profane to give this man a gift of life under these circumstances." This concluding flourish served only one purpose: to hammer home the point that already infused the multiple specific comparisons of episodes from those two lives that the solicitor had just set forth: Shawn Humphries had led a worthless life, Dickie Smith had led a worthy one, and a death sentence was warranted on this basis.

The majority contends finally that the prosecution's argument in its entirety involved no more than permissible comments on the evidence. My colleagues emphasize that all of the discussion of the past lives of the victim and the defendant had already been submitted into evidence at the sentencing hearing. The majority notes that "the solicitor's life history comparison contained in the year-by-year chronol-

ogy was based upon facts established during the trial [that] were readily apparent to the jury." *Maj. Op.* at 21.

I do not suggest this evidence was inadmissible. To the contrary, the victim impact evidence was properly submitted. The testimony of Dickie Smith's brother, Randy, and his wife, Pat, was all legitimately designed to underscore the importance of the victim's life to his family members, to his friends, and to the community he served. Comment upon this evidence would clearly conform to the strictures of *Payne* and the rhetorical embellishment of the evidence would be well within the latitude afforded closing arguments.

But that is not what occurred in this case. That the facts from which the prosecutor drew his comparison were already in the record does not cure the prejudice resulting from the format in which the prosecutor chose to present a significant portion of his close. The comparison between the victim and perpetrator that formed the focus of this closing argument reached the point at which differences in degree ripen into differences in kind. The State did not seek simply to comment on the evidence. The State did not seek simply to explore the terrible consequences of this crime for the victim's family and community or to lay out the victim's uniqueness as an individual. The State sought to present two peoples' lives in a crafted invitation to the jury to compare their relative worth. This side-by-side comparison of the relative value of two lives was calculatedly incendiary and rendered the sentencing fundamentally infirm.

Viewed against the backdrop of this message, the majority's suggestion that the prosecutor obeyed the prohibition on judgments of comparative human worth by avoiding the words "compare" and "value" or "worth" is a simple invitation to subterfuge, condoning egregious human worth comparisons in substance so long as certain phrases are avoided. Likewise, the concurrence's suggestion that the prosecution was doing no more here than saying Humphries "could have made better choices" is untenable. *Conc. Op.* at 41. The prosecutor could have argued the tragic nature of Humphries' choices, underscored his responsibility for those choices, and attacked Humphries' mitigating evidence all day long without indulging an argument of relative human worth. Left with no explanation for the comparison that occurred here, let alone a plausible one, I can only state again

what appears so obvious from the record: that the prosecutor told the jury that the intrinsic value of one life over time was less than that of another, and that a sentence of death was warranted on that basis.

## II.

This case comes to us on collateral review. In reviewing a state court judgment on collateral attack, our obligations of deference to state court proceedings are quite plain. Congress has declared that a federal court may not grant a writ of habeas corpus unless the state court's holding "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1) (2000), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The question before us is simply whether the state court's decision in this case violated clearly established federal law by applying "a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The majority and I agree that the pivotal case in this analysis is *Payne v. Tennessee*, 501 U.S. 808 (1991). But while we agree that *Payne* is the applicable case, we could not disagree more on what *Payne* plainly holds. *Payne* unequivocally endorsed the use of victim impact evidence in capital proceedings, but it never came close to placing any imprimatur on the sort of closing argument the prosecutor offered here. In fact, the Supreme Court issued plain warnings to steer clear of human worth comparisons, warnings which I regret to say the majority has not heeded.

## A.

*Payne* itself provides a good example of the uses to which victim impact evidence may be put. The case involved the murder of a twenty-eight-year-old mother and her two-year-old daughter whom the defendant viciously stabbed to death with a butcher knife. The *Payne* Court approved the introduction of victim impact evidence concerning the physical and psychological harm inflicted on the victim's three-year-old son who was also stabbed repeatedly, yet sur-

vived, and who thus witnessed the murder of his mother and sister. Testimony by surviving relatives of the victim provides a paradigm case for the use of victim impact evidence, regardless of whether those survivors actually witnessed, as the young boy did in *Payne*, the commission of the crime.

*Payne* made clear that victim impact evidence, or "evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family," has an important and legitimate place in capital sentencing. 501 U.S. at 817. States are permitted to introduce such evidence to offer the jury "a quick glimpse of the life which a defendant chose to extinguish, or [to demonstrate] the loss to the victim's family and to society which has resulted from the defendant's homicide." *Id.* at 822 (quoting *Mills v. Maryland*, 486 U.S. 367, 397 (1988) (Rehnquist, C.J., dissenting))(internal quotations omitted). Grounding a capital sentence in considerations of this sort does not violate the traditional precepts of sentencing. On the contrary, victim impact evidence informs the jury of the "specific harm caused by the crime in question," *id.* at 825, and the consequences of a criminal act have long been a factor on which punishment may properly rest. *Id.* at 819-20, 825. For this reason, forbidding states from allowing victim impact evidence in sentencing proceedings would reduce the deceased to a "faceless stranger at the penalty phase of a capital trial [and] may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder." *Id.* at 825 (quoting *South Carolina v. Gathers*, 490 U.S. 805, 821 (O'Connor, J., dissenting)) (internal quotations omitted).

*Payne* also rebutted in turn each argument against victim impact evidence that had informed the earlier decisions of *Booth v. Maryland*, 482 U.S. 496 (1987), and *South Carolina v. Gathers*, 490 U.S. 805 (1989). While *Booth* and *Gathers* asserted that such evidence led to arbitrary imposition of the death penalty, the *Payne* Court found that any effect on the incidence of capital sentences was consonant with the principle that punishment may be calibrated to fit the harm a crime had caused. *See Payne*, 501 U.S. at 825. While *Booth* and *Gathers* were concerned that victim impact evidence would frustrate the defendant by forcing a diversion of attention from his case in mitigation to the victim's character, the *Payne* Court concluded that this

was no more prejudicial than the many tactical decisions that must be made in the course of capital litigation. *Id.* at 823. While *Booth* and *Gathers* believed that the individualized consideration of a defendant required in a capital case prohibited victim impact evidence, the *Payne* Court protested that the victim should likewise be accorded individual respect. *Id.* at 822, 825. Finally, the *Payne* Court determined that the approach to sentencing underlying *Booth* and *Gathers* had been too narrow, criticizing the premise of those cases that victim impact evidence "do[es] not in general reflect on the defendant's 'blameworthiness,' and that only evidence relating to 'blameworthiness' is relevant to the capital sentencing decision." *Id.* at 819.

*Payne* thus endorses, explicitly and unequivocally, the use of victim impact evidence at the punishment phase of a capital trial. Yet, while the states plainly "remain free, in capital cases, as well as others, to devise new procedures and new remedies to meet felt needs," *id.* at 824-25, neither *Payne* nor any other Supreme Court case has suggested that victim impact evidence may be used without limit, constraint, or without reference to the harm caused by the crime to those aggrieved. This fundamental idea of *harm* caused the victim and his family by the crime of the defendant pervades the *Payne* opinion. Indeed, it is mentioned by the Court as the rationale for victim impact evidence no fewer than ten times. *See id.* at 819 (victim impact evidence is relevant for the "harm caused by the defendant as a result of the crime"); *id.* at 820 (sentences are commonly calibrated to the "harm done by the criminal"); *id.* (sentencing judge's discretion is properly guided by consideration of the "harm caused by the crime"); *id.* at 821 (describing federal and state sentencing reform that enables "the sentencing authority to consider information about the harm caused by the crime committed by the defendant"); *id.* (victim impact evidence is "designed to portray for the sentencing authority the actual harm caused by a particular crime"); *id.* at 825 (factors generally relating to "specific harm" caused by crime have long been "considered by sentencing authorities"); *id.* (evidence submitted was "illustrative of the harm caused by Payne's double-murder"); *id.* (states may properly authorize consideration of "specific harm caused by the defendant" in assessing punishment); *id.* at 826 (evidence submitted "illustrated quite poignantly some of the harm that Payne's killing had caused"); *id.* (sentencer may "bear in mind" such "harm" while also considering defendant's mitigating evidence).

Notably absent from the Court's discussion is any hint of imprimatur for human worth comparisons, let alone of the naked variety that occurred here. For human worth comparisons are so far removed from the Court's central concern of *harm* that it is inconceivable that the Court somehow meant to allow them. Indeed the human worth comparison offered in this case presents the very antithesis of *Payne*'s rationale for victim impact evidence. Evidence introduced to inform the sentencing authority of the "specific harm" caused by the crime in question, *id.* at 825, is the very opposite of comment weighing the general value of the victim's and defendant's entire lives. Testimony focusing on the consequences of the crime in question ensures that victim impact evidence promotes rather than retards the fundamental purposes of the sentencing function. Argument drawing a comparative judgment of human life roams far afield from the consequences of the criminal act.

Indeed, one searches the *Payne* opinion in vain for any indication that the Court meant to condone such comparative judgments. In the one part of the opinion where the Court considers comparative appeals of this sort, it does so only to condemn them. *Payne* considers the question, raised in *Booth*, of whether victim impact evidence might permit "a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy." *Id.* at 823 (citing *Booth*, 482 U.S. at 506 n.8). In response to this possibility, the Court professes incredulity, noting that

> [a]s a general matter . . . victim impact evidence is not offered to encourage comparative judgments of this kind — for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead *each* victim's 'uniqueness as an individual human being,' whatever the jury might think the loss to the community resulting from his death might be.

*Id.* at 823. The Court noted that "[i]n the majority of cases . . . victim impact evidence serves entirely legitimate purposes." *Id.* at 825. But it chose to conclude its discussion in precise terms. It stated that "if the State chooses to permit the admission of victim impact evidence"

— previously defined as the "personal characteristics of the victim and the emotional impact" of the crime, *see id.* at 817 — "and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Id.* at 827.

The Court's discussion of victim impact evidence in *Payne* therefore signals a clear disapproval for the kind of inter-personal comparison that occurred here. The South Carolina Supreme Court held (and the majority appears to agree) that *Payne* only prohibited comparisons between the relative worth of victims, rather than comparisons between victims and perpetrators. *See Humphries v. State*, 570 S.E.2d 160, 167-68 (S.C. 2002). It is true that a comparison of one victim to another may differ from a comparison of a victim to a defendant. The former permits the introduction of collateral evidence — the worthiness of other members of society — while the latter invites commentary on evidence already before the jury. Nonetheless, distinguishing these two types of human worth comparisons splits an awfully thin hair.

In fact, contrary to the majority's claim that comparative worth judgments are "inevitable" after *Payne*, *Maj. Op.* at 23 n.6, 29 n.9, a fair examination of the case reveals that the Court did not even believe that arguments of this sort would be raised in capital proceedings, much less proffered as the basis for the death sentence. The pairing of two people, one actual and one supposed, contemplated by the example which *Payne* condemns, *see* 501 U.S. at 823, does not suddenly become acceptable when the hypothetical element of the dyad is replaced by the prosecutor with the person of the defendant.

Quite the opposite, it is the relative nature of these sorts of judgments that provoked the Court's disapproval, not the imaginative leap that resort to a conjectural comparator requires. Life in our society is not the relative matter that the prosecutor tried to make it. Each life stands instead on a footing of its own. This is the essential point the Court expresses. Otherwise it is impossible to imagine why the Court would tether its overruling of *Booth* and *Gathers* to their holdings "that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing," *id.* at 830 n.2, why it would take pains to emphasize that some victim impact evidence, otherwise proper, might be so

prejudicial that "it renders the trial fundamentally unfair," *id.* at 825, and why it would see fit to emphasize that proper victim impact evidence shows "*each* victim's *'uniqueness as an individual human being*.'" *Id.* at 823 (emphasis added in part).

To this point, I have confined myself to a textual analysis of the *Payne* opinion. But an overview of *Payne* leads to the very same conclusion as a textual dissection, namely that a victim's status as "an individual human being," *id.*, does not allow human worth comparisons, let alone approve them. An overview of *Payne* and its sentencing philosophy is necessary because it likewise forfends the majority's conclusion.

The *Payne* Court had to proceed at a high level of generality because the decisions it overruled had already ascended to this register. *Booth*, for instance, held that sentencing evidence must relate only to the defendant's blameworthiness. *See id.* at 818-19 (citing *Booth*, 482 U.S. at 504, 505). But *Payne* criticizes the conception of punishment set forth in *Booth* and *Gathers* as too cramped. Instead, a sentencer can properly consider the "harm caused by the defendant as a result of the crime charged." *Id.* at 819. The Court thus explicitly extends the preoccupation in *Booth* with "the subjective guilt of the defendant" to encompass also "the harm caused by his acts." *Id.* at 820.

The significance of *Payne* is that it added harm to *Booth*'s discredited insistence that sentencing evidence must relate solely to the defendant's blameworthiness. *See id.* at 818-19 (citing *Booth*, 482 U.S. at 504, 505). *Payne* envisions blame and harm as the two organizing categories of sentencing evidence. Indeed, *Payne* stands for the proposition that the relevance of arguments in capital sentencing should be grounded in at least one of these two principles. And it is possible, no doubt, to reconstruct the chain of reasoning that supports such a relationship for every category of evidence that state and federal sentencing law permits. Criminal history, for instance, relates to blame. *See, e.g.*, *U.S.S.G. Ch. 4, intro. comment* ("A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment.") Victim impact evidence of the sort *Payne* contemplated, meanwhile, relates in like manner to harm.

Comparative human worth judgments, in stark contrast, defy classification under this rubric. For in their general resort to the respective worthiness of human lives, they do not bear in the slightest on the defendant's culpability or the deleterious consequences of his criminal act. Indeed, the majority offers not one argument that relates human worth comparisons to either of these seminal concepts. Instead, the majority retreats behind nebulous pronouncements about "the boundaries of a question the jury was required to consider," *Maj. Op.* at 25, and observations that "[t]he bulk of the solicitor's argument was not that Humphries should die because his life was worth less than Dickie Smith's." *Id.* at 21. Propositions such as these simply ignore both what the prosecutor said and what he did in breaching the principles that *Payne* was all about.

The majority concludes its own review of *Payne* by saying that the opinion has "a few shortcomings," *Maj. Op.* at 29 n.9, and that it has made human worth comparisons "inevitable." *Id.*, 23 n.6. For its part, the concurrence likewise finds fault with *Payne*, because it dismisses inconvenient statements in that opinion as "dicta," *Conc. Op.* at 35, 37, thus ignoring the Supreme Court's explanation of the basis for its own decision. I do not think *Payne* has any "shortcomings." Far from making human worth comparisons "inevitable," *Payne* condemns them by stressing the quality of a victim as an individual human being. *See Payne*, 501 U.S. at 825. Thus there was nothing at all "inevitable" about this prosecutor's decision to take leave of the focus on Dickie Smith and Shawn Paul Humphries as individuals and launch into an argument which, by laying their two lives side-by-side, undermined that individuality. If this were all so "inevitable," one wonders why it is the only argument in this country to indulge such an extended and explicit weighing of the relative worth of human life.

The extent of the State's transgression is, sadly, beyond salvaging through the aforementioned standard of review. For due process at its core contains a commitment to treat all litigants as individuals of equal dignity. *See Lyng v. Castillo*, 477 U.S. 635, 636 n.2 (1986). This individuality is compromised, however, when prosecutors implore juries to hand down sentences on theories of comparative human worth. The past lives this jury was exhorted to balance bore no connection or relation, save for the tragic events which brought the parties into court. Yet the State engaged in sweeping comparisons of

the life histories of the victim and the defendant, coopting, in the process, events far removed in time and place and relevance from the proper inquiry at hand. The very concept of a sentence should have operated to preclude this misadventure. One does not receive a sentence for leading a less valuable life than someone else. One receives a *sentence* under our system for having committed a *crime.* Violating this principle, the prosecutor's human worth comparison defies my colleagues' justification just as it did the *Payne* decision.

### B.

When one steps back and surveys American sentencing practice, the fact that the majority faces so hard a task in accommodating *Payne* to comparisons of human worth is not surprising.

The comparative worth argument relied on here fell within the category of factors that the Supreme Court has prohibited as unduly prejudicial in the death penalty sentencing context. *See Johnson v. Mississippi*, 486 U.S. 578, 584-85 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 885 (1983)) (prohibiting death penalty decisions "predicated on mere 'caprice' or on 'factors that are constitutionally impermissible or totally irrelevant to the sentencing process'"). The comparison of what Humphries and Smith happened to be doing in 1984 or 1986 or 1988 or at some fortuitous past point in their separate lives is the essence of an arbitrary and capricious circumstance. That Dickie Smith happened to be building houses while Shawn Paul Humphries happened to be breaking into houses is a judgment freighted with comparative moral import. It was not, however, a permissible basis under the Due Process Clause on which to condemn the defendant to death. Juries are free to mete out capital verdicts based on the evidence before them, the consequences of the crime for the victim's family and loved ones, the presence or absence of a variety of aggravating or mitigating circumstances, or the sheer heinousness of the offense. *See, e.g.*, South Carolina Code § 16-3-20(C). All of these factors are focused on individuals qua individuals and are not comparative in nature. But one thing the centerpiece of closing argument cannot invite is a sentence on the basis that one person is of more intrinsic value than someone else. A defendant may not be condemned simply for being deemed, over the long trajectory of life, a less estimable human being than his victim.

In the wake of *Payne*, the federal government, the military, and thirty-three of the thirty-eight states with the death penalty have authorized the use of victim impact evidence in capital sentencing. John H. Blume, *Ten Years of Payne: Victim Impact Evidence in Capital Cases*, 88 Cornell L. Rev. 257, 267 (2003). Unsurprisingly, while these jurisdictions allow a broad range of victim impact evidence, none sanctions the sort of comparative worth arguments advanced in this proceeding. To place the matter in perspective, the United States Sentencing Guidelines, made advisory after *Booker*, contemplate a multitude of enhancements and departures for a variety of factors relating to the crime. These include the knowing selection of a vulnerable victim, U.S.S.G. § 3A1.1, the perpetrator's aggravating role in the offense, U.S.S.G. § 3B1.1, the abuse of a position of trust or use of a special skill in committing the offense, U.S.S.G. § 3B1.3, the infliction of significant physical or extreme psychological injury on the victim, U.S.S.G. § 5K.2.2, 5K2.3, the use of a weapon or dangerous instrumentality in the commission of the crime, U.S.S.G. § 5K2.6, and the crime's purpose of facilitating or concealing another offense, U.S.S.G. § 5K2.9. One can look in vain among these enhancements and departures for any factor remotely resembling the relative worth of the victim's and defendant's lives. Such a factor would hardly form the basis of a two-level increase, much less the imposition of a sentence of death.

If we ignore *Payne*'s condemnation of the use of comparative human worth arguments, we invite future abuses. As the trial judge exclaimed, this was "one of the best arguments I have ever heard in my life given in a closing argument . . . in terms of the technique, . . . delivery, effectiveness." The argument was so effective, however, precisely because it was so improperly prejudicial to Humphries, and ignored the bedrock premise that "punishment should be directly related to the personal culpability of the criminal defendant," *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring).

My concurring brother seeks repeatedly to condemn the dissent's discussion of sentencing principles without ever trying to rebut it. Indeed, the concurrence fails to come to grips with the fact that what transpired in this case was a profound departure from traditional American sentencing practice as it existed both before, during, and after the *Payne* decision. By breaking from sentencing regimes which

relate punishment to the defendant's actions, the majority also departs from the historic understanding that punishment is not a matter of status, but rather a function of the legal wrong a citizen has committed and his responsibility therefor. The majority allows this defendant to be executed, not for doing, but for being a less worthy person than someone else. Such a sentence strays so far from the normal ambit of a court of law as to strain human faculties. Measuring the relative value of human beings on whatever ineffable scale that applies could not be a more dangerous exercise. Thankfully, American sentencing practice has until now limited itself to the more manageable domain of crimes and their consequences.

### III.

The application of the federal habeas statute here requires us to inquire whether the state court applied the governing legal rule "unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000). The federal law that governs Humphries' claim of ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). The majority devotes the lion's share of its attention to whether the prosecutor's comments respected *Payne*. *Payne* is of course central to this case. But it provides a rule of decision here only insofar as this record presents a glaring violation of its dictates, which the defense should have noticed and complained of forthwith. The failure to do so here was a constitutional wrong under the Sixth Amendment.

The standards in this area are well settled. Under *Strickland*, the defendant must first "show that counsel's performance was deficient." *Id.* at 687. To establish this deficiency, the defendant must produce evidence that the "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Second, the defendant must show that the deficient performance resulted in actual prejudice to his case. A showing of prejudice requires the defendant to prove that "counsel's errors were so serious as to deprive the defendant of a fair trial." *Id.* at 687. In the context of a capital sentencing proceeding, the question is whether "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Prejudice is established in a capital case where the jury is considering both aggravating and mitigating

evidence during sentencing if "there is a reasonable probability that at least one juror would have struck a different balance," but for the constitutional error. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003). Under *Strickland*, the failure of Humphries' counsel to cry foul when the prosecutor compared the victim's general value to that of the defendant clearly supports a Sixth Amendment violation.

I have already described the degree to which the prosecutor's human worth comparisons flew in the face of existing federal law and established sentencing practice. I do recognize that state law on sentencing evidence is permissive. *See State v. Gulledge*, 487 S.E.2d 590, 594 (S.C. 1997). But there are boundaries to be respected, and the prosecutorial comments here travelled well beyond them. Coming, as they did, at the close of proceedings, and nestled among several explicit requests to put his client to death, the comparative worth exhortations in these comments should have struck defense counsel instanter.

I realize that counsel's decisions should not be picked apart by hindsight. Caution is particularly needed in collateral proceedings, when issues that appear plain to a habeas court have only become so after several rounds of anterior review. Advocates must often make instantaneous decisions with imperfect information and without the benefit of considered judgment. And, although correcting every error of counsel might yield some benefit, it would also create far more substantial costs going forward. In particular, second-guessing counsel's decision not to object at closing argument would encourage a slew of vexatious challenges that would needlessly distract the court and jury. Worse still, such hindsight might discourage tactical choices to remain silent, prompting lawyers to off-putting interjections that would needlessly imperil their client's defense. Mindful of ill possibilities such as these, this circuit has always indulged a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Truesdale v. Moore*, 142 F.3d 749, 753-54 (4th. Cir. 1998).

That having been said, there are some occasions when counsel must object or lose all claim to his defined Sixth Amendment role as representative of the accused. I emphasize yet once more the unprecedented character of the prosecution's closing argument and the extent

of its departure from the most settled principles of American sentencing. For a lawyer to allow his client to be put to death on the basis of such an argument is to deprive the defendant of any semblance of effective assistance at the precise moment when he needed that assistance most.

Neither of Humphries' two counsel objected to the State's comparative worth arguments at trial. They did lodge a general challenge to the admissibility of victim impact evidence without prior notice, which they reserved for appeal. But they were remarkably silent during the comparative worth arguments, and admitted after trial that their failure to object constituted ineffective assistance of counsel. Their post-trial admission here must be taken as more than a mere tactic. While the concurrence contends that the failure of an objection was "objectively reasonable trial strategy," *Conc. Op.* at 42, this is a creative reconstruction of counsels' thought processes that neither the majority, nor the South Carolina Supreme Court, nor the State, nor counsel itself has ever sought to advance. The failure to object was, in counsel's words, "not a matter of trial strategy or tactics," *J.A.* at 219, but of simply dropping the ball. The State's argument, which was at once without precedent and at odds with traditional precepts of due process, called for Humphries' counsel to exercise those skills which had led to their appointment.

There is also no doubt that this record presents a "reasonable probability that at least one juror would have struck a different balance," but for the constitutional error. *Wiggins*, 539 U.S. at 537. The trial judge recognized as much when he profusely complimented the prosecutor's close. Counsel's failure to object to the prosecutor's comments therefore prejudiced Humphries under the second prong of *Strickland*. Comments of this sort represent the types of appeal to jurors whose potential for prejudice the Supreme Court has long condemned in the death penalty context. *See Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring); *Gardner v. Florida*, 430 U.S. 349, 358 (1977) (plurality opinion). Coming, as it did, just before the jury began its deliberations, the emotionally charged human worth comparison made by the prosecutor could only have caused Humphries improper prejudice.

The majority attempts to deny this conclusion by maintaining that these comments were quantitatively and qualitatively unimportant in

the totality of the prosecutor's closing. But this argument is flawed on at least two grounds. First, it is simplistic. The offensive portions of the prosecutor's final presentation may well take up "less than four pages of [the] approximately twenty-eight" that it occupies in full. *Maj. Op.* at 21. But we would be automata, not judges, if we undertook inquiries of the sort mandated by the second prong of *Strickland* with the kind of approach the majority's computation represents. Indeed, the product of those inquiries would be reduced to arbitrariness were we to dilute the judicial enterprise in such a manner.

Second, my colleagues' position fails to appreciate the affective qualities of the oratory in which the human worth comparison occurred. Contrary to the claim that the "solicitor's comparison of the lives of both Humphries and Dickie Smith" was not "the centerpiece of the solicitor's argument," *Maj. Op.* at 20, this comparison was in fact the piece-de-resistance of the prosecutor's presentation to the jury. One simply cannot review the argument without seeing that it builds inexorably towards this apex. The devices the prosecutor employs while making the comparison — dramatic repetition of the words "[t]hat's the same year," punctuation of a plea to the jury with the phrase "how profane," the plaintive repetition of "if not" in his ultimate exhortation, and the series of rhetorical questions — all stand in stark contrast to the prosaic remainder of the record. Appreciation of an argument's dynamic compels the conclusion that the solicitor's human worth comparison was intended to be, and was, a climactical flourish designed to move the jury to a sentence of death.

I respect fully the prerogative of lawyers to make an emotional close. The prosecutor's position as advocate must also afford him wide latitude of tactic. But the objective must at times extend beyond securing the State's wishes at any cost. To a juror unschooled in the ways of the law, the solicitor's human worth comparison may have appeared a legitimate legal appeal, not the departure from historic sentencing procedure that it was. Thus assured that the State's invidious invitation was permitted, at least one juror may well have consciously engaged what would otherwise have remained only faintly implicit in the evidence. Under *Wiggins*, this possibility satisfies the prejudice prong of *Strickland* and supports resentencing.

### IV.

Capital procedure in our system must remain largely the province of the states. And victim impact has many good and legitimate uses, among them awakening juries to the tragic toll of serious crime. But the comparison here was an abuse of this powerful prosecutorial tool, an abuse that no reasonable attorney would sit and greet with silence. To argue that a defendant should be sent to death because his life was of less intrinsic value than his victim is to ask a jury to decide, not on the character of the crime, not on the consequences of the crime, not on the criminal record of the perpetrator of the crime, but on some unfettered evaluation of human worth that works improper prejudice.

Victim impact evidence may play an especially important part in capital proceedings where the crime has caused almost unfathomable pain. But no state sentencing practice nor precept of federal law should be read to permit a capital sentence to be based on a comparison of the relative value of human life or worth of human beings. Human worth comparisons are the hallmarks of totalitarian governments. They do not belong in our country. Societies have gotten into the deepest sort of trouble by making these comparisons an explicit basis for the imposition of death. The most terrifying regimes of the Twentieth Century were those in which governments weighted the value of the lives of their citizens as a prelude to executing them.

I realize that the transgression before us today does not even approach the most terrible examples of human expendability. I appreciate that the sentence Humphries challenges was preceded by an adjudication of guilt. And I am well aware that a variety of safeguards in federal and state law work to protect the legitimacy of such convictions.

But to say that Humphries was properly found guilty is one thing and to say that he can properly be executed is quite another, when his sentence is based on the kind of extraordinary arguments that the prosecutor's presentation represents. To accept this sentence is to set foot on a road Americans will not recognize and our Constitution will not tolerate. With great respect for my friends in the majority, I would not take a single step along this path.

Judge MICHAEL, Judge GREGORY, and Judge DUNCAN join me in this dissent.